STEPHEN J. JOHNSON, PETITIONER *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11556–09L.          Filed May 31, 2011.

P had taxable income of $1.7 million in 1999 and $1.8 million in 2000. P filed income tax returns for those years in 2002 but paid no income tax. The Internal Revenue Service (IRS) assessed tax of $514,164 for 1999 and $565,268 for 2000 and then served on P notice of the filing of a notice of Federal tax lien (NFTL) and a notice of proposed levy to collect P's liabilities that (with interest and penalties) totaled $1,586,952.45. P requested a collection due process (CDP) hearing, during which he proposed an offer-in-compromise (OIC), which he amended several times during 2008 and 2009 while the CDP hearing was in process. During the pendency of the CDP proceeding, P received, from sales of investments, proceeds that he did not pay to the IRS. In December 2008 P amended his OIC to propose payments totaling $400,000, but in April 2009 P advised that he could not afford to make the payments and that he would amend his offer downward to $140,000. R rejected the OIC and issued a notice of deter-

mination sustaining the notices of lien and proposed levy. P filed a petition for review of the determination under I.R.C. sec. 6330(d). During a remand, R's settlement officer determined that P's reasonable collection potential (RCP) was more than three times the amount he had informally proposed, which was based solely on the value of one asset he owned. In calculating RCP, R also took into account, as dissipated assets, certain of the proceeds of P's investment assets that he did not pay to the IRS. After remand R issued a supplemental notice of determination to proceed with collection by lien and/or levy of assessed income tax liabilities, plus interest and penalties, for taxable years 1999 and 2000. *Held*: Where P amended or withdrew an OIC, R's Office of Appeals did not abuse its discretion in declining the terms previously offered in that OIC. *Held*, *further*, in declining P's informal proposal on the grounds that it offered less than his RCP, R's Office of Appeals did not abuse its discretion by including, in its calculation of P's RCP, certain dissipated assets and the settlement officer's final projection of P's future earnings.

*Babcock Maclean* and *Marshall J. Gluck*, for petitioner.
*Justin L. Campolieta*, for respondent.

## OPINION

GUSTAFSON, *Judge*: This is an appeal, pursuant to section 6330(d)(1),[1] by which petitioner Stephen Johnson seeks this Court's review of a determination by the Office of Appeals of the Internal Revenue Service (IRS) to reject Mr. Johnson's proposed offer-in-compromise (OIC) and to sustain the filing of a notice of Federal tax lien (NFTL) and notice of intent to levy, in order to collect Mr. Johnson's unpaid Federal income taxes for tax years 1999 and 2000. That determination was made after the Office of Appeals had conducted a collection due process (CDP) hearing pursuant to section 6330(c) and a supplemental CDP hearing pursuant to a remand by this Court. This matter is currently before the Court pursuant to the parties' joint motion to submit this case on a stipulated record under Rule 122.

The issue for decision is whether the Office of Appeals' rejection of Mr. Johnson's OIC was an abuse of discretion. We hold that the Office of Appeals did not abuse its discretion

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code (26 U.S.C.) as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

by rejecting Mr. Johnson's OIC and sustaining the proposed collection action.

## Background

This case was submitted fully stipulated pursuant to Rule 122, and the facts are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference. At the time he filed the petition, Mr. Johnson resided in the Republic of Singapore.

### Mr. Johnson's background

Stephen Johnson earned a degree in business from the University of Pennsylvania School of Business and worked as an investment banker with UBS AG. Mr. Johnson left UBS AG and in 1999 established Asiawerks Global Investment Group, Pte., Ltd. (Asiawerks), in Singapore. Asiawerks is an investment firm in which Mr. Johnson held a 50-percent ownership interest. In 1999 and 2000, Mr. Johnson's primary sources of regular income were his Asiawerks salary and certain tribal income he received annually as a member of the Saginaw Chippewa Indian Tribe.

### Mr. Johnson's 1999 and 2000 liabilities

During 1999 and 2000, Mr. Johnson liquidated a number of investments.[2] The gain realized from the liquidation of these investments, combined with his other earnings, resulted in AGI of $1,740,936 in 1999 and $1,809,767 in 2000 and in Federal income tax liabilities of $514,164 for 1999 and $565,268 for 2000. Mr. Johnson filed returns for the years 1999 and 2000 in December 2002, but he did not make any payments towards his outstanding liabilities for those years.[3]

---

[2] In his briefs Mr. Johnson stresses the stipulated fact that he liquidated the investments in order to fund a divorce settlement. However, as respondent points out, Mr. Johnson paid $1.25 million to his former wife, whereas his combined adjusted gross income (AGI) for the two years totaled over $3.5 million. In general, when calculating a taxpayer's RCP, a settlement officer may allow an expense for court-ordered payments (e.g., alimony, child support) where the payments are reasonable. Internal Revenue Manual (IRM) pt. 5.15.1.10(3) (Oct. 2, 2009). However, Mr. Johnson's payment of the $1.25 million divorce settlement has no bearing on his RCP here because there are no ongoing payments towards this liability which need to be considered in determining his ability to pay his taxes.

[3] The IRS did, however, apply to those liabilities various overpayment credits from subsequent years and the downpayments Mr. Johnson submitted in connection with various OICs.

*The IRS's notices of lien and proposed levy*

On October 30, 2007, the Internal Revenue Service (IRS) issued Mr. Johnson a "Notice of Federal Tax Lien Filing and Your Right to a Hearing under IRC 6320" (lien notice), notifying him that a Federal tax lien had been filed with respect to his outstanding income tax liabilities for taxable years 1999 and 2000, and notifying him of his right to request a CDP hearing. Two days later, on November 1, 2007, the IRS issued Mr. Johnson a "Final Notice—Notice of Intent to Levy and Notice of Your Right to a Hearing" (levy notice) for those same years, pursuant to sections 6330(a)(1) and 6331(d)(1), advising him of the IRS's intent to levy upon his property. As of that time, his liabilities for 1999 and 2000—including interest and penalties—totaled $1,586,952.45. On November 19, 2007, the IRS received from Mr. Johnson's representatives a Form 12153, "Request for a Collection Due Process Hearing".

The resulting CDP process took nearly four years. Since November 2007 multiple settlement officers have been involved in the CDP process, and through his representatives Mr. Johnson submitted three formal OICs on Forms 656, "Offer in Compromise", and a number of proposed amendments, and he informally proposed an amendment to an OIC. While only the most recent determination (made by the Office of Appeals in April 2010) is now subject to our review, see *Kelby v. Commissioner*, 130 T.C. 79 (2008), an understanding of the CDP hearing history is helpful.

*Hearing before Settlement Officer Hunt*

On November 30, 2007, Mr. Johnson submitted his first formal OIC on a Form 656 dated October 21, 2007 (October 2007 OIC). Under the October 2007 OIC Mr. Johnson proposed to pay, in settlement of his outstanding tax liabilities, a total of $225,000 in 23 monthly installments of $9,375 plus a deposit in the same amount. Mr. Johnson's CDP hearing was initially assigned to Settlement Officer Mark Hunt (SO Hunt), who calculated Mr. Johnson's total tax liability with accruals to be $2,324,895.40.

On March 27, 2008, SO Hunt issued a preliminary determination in which he calculated Mr. Johnson's reasonable

collection potential (RCP) to be $707,386[4] and recommended rejection of the October 2007 OIC. Mr. Johnson's representatives subsequently submitted an informal proposal to amend the October 2007 OIC upward to $456,064, which Mr. Johnson would fund with distributions from his investment in DCM II Doll Technology Investment Fund II LP (DCM) and his interest in Claremont LLC (Claremont). However, in June 2008 the October 2007 OIC was informally amended downward to $350,000 to account for Mr. Johnson's plan to sell his interest in DCM to an unrelated investor for 75 percent of the value.

During an October 28, 2008, telephone conference, Mr. Johnson's representatives informed SO Hunt and his manager that Asiawerks was having financial difficulty and that a portion of Mr. Johnson's 2008 DCM distribution,[5] which had been earmarked to fund the October 2007 OIC and subsequent OICs, was reinvested in Asiawerks to pay his salary. The parties also discussed the inclusion of certain dissipated assets in Mr. Johnson's RCP, the value of Mr. Johnson's interest in Asiawerks, and the disallowance of a monthly loan payment.[6]

On December 17, 2008, after a series of further discussions, Mr. Johnson's representatives faxed to SO Hunt an amended offer-in-compromise proposing a $400,000 cash offer payable within eight months. This offer was formally amended a week later on December 24, 2008, when Mr.

---

[4] SO Hunt calculated Mr. Johnson's RCP to be $707,386 on the basis of a future income potential of $215,653 (monthly income of $9,777 less allowable monthly expenses of $5,284.22 projected over 48 months) and a total equity in assets of $491,733. In calculating Mr. Johnson's RCP for the purpose of this preliminary determination, SO Hunt did not place any value on Mr. Johnson's 50-percent interest in Asiawerks, and he did not treat the distribution from certain investments or the proceeds from the sale of real property as dissipated assets. In ultimately recommending rejection of the October 2007 OIC, SO Hunt rejected Mr. Johnson's assertion that the forced sale of securities giving rise to his tax liabilities for years 1999 and 2000 presented a unique circumstance that would permit the acceptance of an OIC for less than his RCP.

[5] Mr. Johnson received an earlier DCM distribution, apparently in 2006, which is not at issue in the supplemental notice of determination issued by Settlement Officer Covey (SO Covey). For clarity, we will refer to the distribution at issue in the present case as the "2008 DCM distribution."

[6] The parties have continuously disagreed about the disallowance (in computing RCP) of a $3,000 monthly loan payment attributable to a home equity loan that Mr. Johnson's mother took out on behalf of her son. Mr. Johnson claims that the loan was taken out so that he could fund the repayment of his outstanding tax liabilities; however, he failed to substantiate that the loan proceeds were ever used for this purpose. SO Hunt initially proposed to allow this expense in his draft determination, but the Appeals Office ultimately disallowed the expense in the supplemental notice of determination, because Mr. Johnson was not legally obligated to repay the loan and the payments were not a necessary living expense.

Johnson's representatives submitted a revised amended offer-in-compromise (December 24, 2008, OIC), in which Mr. Johnson proposed to pay $400,000 in five bimonthly installments of $80,000.[7]

In his January 2009 draft Appeals case memorandum (ACM), SO Hunt recommended acceptance of Mr. Johnson's December 24, 2008, OIC after calculating Mr. Johnson's RCP to be $364,392.[8] SO Hunt's manager, however, rejected this recommendation. Shortly thereafter, SO Hunt was internally reassigned to an acting position in management.

*Hearing before Settlement Officer DeVincentz*

Settlement Officer D.W. DeVincentz was assigned to complete Mr. Johnson's CDP hearing upon SO Hunt's reassignment. After reviewing all the prior correspondence and records, SO DeVincentz recalculated Mr. Johnson's RCP to be $513,872[9] and advised Mr. Johnson's representatives that a short-term cash offer of $500,000, with an additional $20,000 downpayment, would be an acceptable collection alternative.

On April 10, 2009, Mr. Johnson's representatives informed SO DeVincentz that Asiawerks was in the process of winding up, and thus Mr. Johnson could no longer afford the payment schedule proposed in his December 24, 2008, OIC. Mr. Johnson's representatives also informed SO DeVincentz that Mr. Johnson had used the remainder of his DCM distributions to fund the business operations of Asiawerks and for living expenses, and that his only remaining asset was his post-distribution interest in DCM, valued at $60,000. For that reason,

---

[7] The first installment of $80,000 consisted of $42,500 (which Mr. Johnson would pay upon acceptance of the December 24, 2008, OIC) plus the $37,500 previously paid in connection with the October 2008 OIC.

[8] SO Hunt's January 2009 draft ACM was not a final product and contained a number of errors, including a misstatement of Mr. Johnson's RCP. Mr. Johnson's RCP was determined to be $364,392 by combining future income potential of $7,800 and equity in assets of $356,592. This figure did not include the combined $80,000 in cash already remitted to the IRS in connection with Mr. Johnson's October 2007 OIC and December 24, 2008, OIC.

[9] SO DeVincentz recalculated Mr. Johnson's RCP to be $513,872 by combining $77,280 in future income potential with $436,592 in asset equity. In recalculating Mr. Johnson's future income potential, SO DeVincentz determined that only $1,842 of the $3,000 monthly loan payment was allowable as a necessary living expense, representing the difference between the $3,000 Mr. Johnson was currently paying and the $1,158 his mother had been paying towards her mortgage before the monthly loan payment arrangement. This effectively increased Mr. Johnson's disposable income by $1,158 per month. SO DeVincentz added the $1,158 to the $130 in net monthly income determined by SO Hunt, which he then multiplied by 60 months to arrive at a future income potential of $77,280. Moreover, SO DeVincentz increased Mr. Johnson's asset equity figure from $356,592 (as calculated by SO Hunt) to $436,592 by adding the value of Mr. Johnson's discounted interest in a coal mine owned by Asiawerks.

Mr. Johnson directed his representatives to amend the December 24, 2008, OIC downward to $140,000, which would consist of the $80,000 he had previously remitted in connection with his prior OICs and his remaining $60,000 interest in DCM. SO DeVincentz declined this informal offer of $140,000 and informed Mr. Johnson that a notice of determination sustaining the proposed collection action would be issued.

*Determination, Tax Court petition, and remand*

The Office of Appeals issued its notice of determination on April 17, 2009. Mr. Johnson filed a petition with the Court challenging the IRS's rejection of his OIC and arguing that an offer of $140,000 was acceptable given his financial situation. Respondent subsequently moved for remand because the notice of determination did not explain how SO DeVincentz had calculated Mr. Johnson's RCP. This Court remanded the case to the Office of Appeals on December 17, 2009, granting Mr. Johnson a supplemental administrative hearing pursuant to section 6330.

*Supplemental hearing and determination*

Upon remand, Settlement Officer Covey was assigned to Mr. Johnson's hearing and reviewed the administrative record. At that time, Mr. Johnson's unpaid balance (including interest and penalties) was $2,468,936.29; and SO Covey tentatively calculated Mr. Johnson's RCP to be only about one-fourth of that—i.e., $568,408 [10]—on the basis of her understanding of Mr. Johnson's financial situation.

A face-to-face conference was held on March 2, 2010, in which SO Covey and Mr. Johnson's representatives discussed the issues relating to Mr. Johnson's unpaid tax liabilities, including the dissipation of Mr. Johnson's 2008 DCM distribution. Mr. Johnson's representatives claimed that the $277,000 2008 DCM distribution was used to pay Mr. Johnson's representatives in connection with the ongoing Tax

---

[10] SO Covey initially calculated Mr. Johnson's RCP to be $568,408 on the basis of a future income potential of $212,784 over a period of 48 months and a total equity in assets of $355,625. SO Covey noted, however, that before a final calculation could be determined she needed more information regarding an appraisal of Asiawerks and other companies Mr. Johnson held interests in, as well as documentation substantiating that the liquidation proceeds of certain investments were used for necessary living expenses.

Court proceeding and to fund the downpayment of the December 24, 2008, OIC, and that any remaining funds were either reinvested into the failing Asiawerks or used for personal living expenses. SO Covey requested that Mr. Johnson provide by March 16, 2010, a number of documents substantiating his current financial affairs, including: proof of disbursements from the 2008 DCM distribution and the liquidation of Mr. Johnson's investment in Claremont; closing statements; settlement sheets; bank statements verifying Mr. Johnson's claim that the money he reinvested in Asiawerks to pay his salary had been used for necessary living expenses; Mr. Johnson's current Form W–2, Wage and Tax Statement, to corroborate a supposed reduction in his tribal income; current statements establishing Mr. Johnson's remaining interests in DCM and Claremont; and Forms 433–B, "Collection Information Statement for Businesses", for all companies in which Mr. Johnson held an interest. In response, Mr. Johnson's representatives faxed SO Covey a letter on March 12, 2010, advising SO Covey that the Claremont investment had paid out $11,317 and was now finished, and advocating that SO Covey apply a flexible standard in calculating Mr. Johnson's RCP, given that Asiawerks was now defunct. (As is explained below, most of the requested documents were never provided to SO Covey.)

In a letter dated March 12, 2010, Mr. Johnson's representatives reiterated that his current offer was $140,000, consisting of $80,000 already remitted in connection with his prior OICs plus $60,000 that he believed he could obtain by liquidating his remaining $60,000 interest in DCM. That is, Mr. Johnson's $140,000 proposal presumed that, beyond the $80,000 he had *already* remitted, the IRS could reasonably expect to collect from him in the future no more than $60,000. At this time, Mr. Johnson's unpaid income tax liabilities (with accruals) totaled approximately $2.5 million.

On the basis of her review of the entire administrative record, SO Covey ultimately concluded that neither of Mr. Johnson's proposed offers—i.e., neither the informal proposal of $140,000, nor the December 24, 2008, OIC of $400,000 that he had withdrawn—would be an acceptable offer, given her calculation of his RCP. In evaluating Mr. Johnson's proposals, SO Covey calculated his RCP to be $445,181 (i.e., about 18 percent of his total liability of about $2.5 million), on the

basis of total equity in assets of $288,317 and future income potential of $156,864. Her asset computation was as follows:

| | |
|---|---:|
| Personal bank accounts | $7,500 |
| Value of remaining DCM interest | 60,000 |
| Dissipated assets: | |
| Claremont interest sold 4/2009 | 11,317 |
| DCM interest sold 6/2009 | 209,500 |
| Total | 288,317 |

SO Covey's determination of Mr. Johnson's future income potential first computed his monthly disposable income (income over allowable expenses) and then multiplied that amount by 48 months, to yield four years' worth of disposable income. For his monthly income, SO Covey took the figures from Mr. Johnson's own financial statement—i.e., wages of $3,267 per month and tribal income of $6,510 per month, totaling $9,777 per month. SO Covey's monthly expense figures differed somewhat from Mr. Johnson's (in some respects to his advantage, but overall to his disadvantage), and both are set out here:

| | *Mr. Johnson* | *SO Covey* |
|---|:---:|:---:|
| Monthly income | $9,777 | $9,777 |
| Monthly expenses: | | |
| National Standard | $600 | $760 |
| Housing and utilities | 3,117 | 3,117 |
| Health care | 0 | 60 |
| Taxes | 1,500 | 1,500 |
| Transportation— operating cost | 385 | 385 |
| Transportation—owner- ship cost | 915 | 489 |
| Child care | 300 | 198 |
| Loan payment | 3,000 | 0 |
| Total expenses | 9,817 | 6,509 |
| Monthly disposable income | −40 | 3,268 |

Thus, SO Covey disagreed with Mr. Johnson both about the amount of his assets (i.e., she included his personal bank accounts and about $220,000 of dissipated assets) and about the expenses that should be taken into account in figuring

his disposable income (chiefly, she made no allowance for his $3,000 loan payment).[11]

Mr. Johnson did not thereafter provide, in response to SO Covey's requests, any documentation substantiating that the funds reinvested in Asiawerks were used for necessary living expenses, nor Forms 433–B for interests he owned in various businesses. SO Covey therefore recommended, and the Office of Appeals issued, a "Supplemental Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330" on April 20, 2010, fully sustaining the proposed lien and levy actions of the Collection Division. In response to this supplemental notice of determination, Mr. Johnson filed an initial brief with this Court, arguing that the Office of Appeals failed to properly apply the IRM provisions on dissipated assets and thus abused its discretion in rejecting Mr. Johnson's OICs.

## Discussion

### I. *Legal principles for "collection due process"*

#### A. *Right to agency-level hearing*

Section 6330 provides that, before a levy may be made on any property or right to property pursuant to section 6331, a taxpayer is entitled to notice of the Commissioner's intent to levy and of the taxpayer's right to a fair hearing before an impartial officer of the IRS Office of Appeals. Sec. 6330(a) and (b). Similarly, section 6320 provides that after the filing of an NFTL under section 6323, the Secretary shall furnish written notice of the filing and of the taxpayer's right to a hearing, which is generally conducted consistent with the procedures set forth in section 6330(c), (d), and (e). Sec. 6320(c).

At the agency-level CDP hearing, taxpayers may raise challenges to "the appropriateness of collection actions" and may make "offers of collection alternatives, which may include the posting of a bond, the substitution of other assets, an installment agreement, or an offer-in-compromise." Sec. 6330(c)(2)(A). The appeals officer must consider those issues, verify the requirements of applicable law and administrative procedure have been met, and consider "whether any proposed collection action balances the need for the efficient

---

[11] See *supra* notes 6 and 9.

collection of taxes with the legitimate concern of the person [involved] that any collection action be no more intrusive than necessary." Sec. 6330(c)(3)(C). As his collection alternative, Mr. Johnson chose to submit OICs. In the case before us, Mr. Johnson disputes the IRS's failure to accept his latest OIC.

B. *Offers-in-compromise*

Section 7122(a) authorizes the Secretary to compromise any civil or criminal case arising under the internal revenue laws. Section 7122(c) provides that the Secretary shall prescribe guidelines for evaluation of whether an OIC should be accepted, and thus the decision whether to accept or reject an OIC is left to the Secretary's discretion. *Fargo v. Commissioner*, 447 F.3d 706, 712 (9th Cir. 2006), affg. T.C. Memo. 2004–13; 26 C.F.R. sec. 301.7122–1(c)(1), Proced. & Admin. Regs.

The regulations promulgated under section 7122 set forth three grounds for compromise of a taxpayer's liability. These grounds are doubt as to liability, doubt as to collectibility, and the promotion of effective tax administration. 26 C.F.R. sec. 301.7122–1(b). In his CDP hearing Mr. Johnson sought a compromise based on doubt as to collectibility.

The Secretary may compromise a tax liability based on doubt as to collectibility where the taxpayer's assets and income are less than the full amount of the liability. 26 C.F.R. sec. 301.7122–1(b)(2). Under the Commissioner's administrative procedures, an OIC based on doubt as to collectibility will be acceptable only if it reflects the taxpayer's "reasonable collection potential" (RCP). Rev. Proc. 2003–71, sec. 4.02(2), 2003–2 C.B. 517, 517. RCP is generally calculated by multiplying a taxpayer's monthly income available to pay taxes by the number of months remaining in the statutory period for collection, see sec. 6502, and adding to that product the realizable net equity in the taxpayer's assets. Both parties appear to agree that Mr. Johnson's RCP is substantially less than his tax liability, which stood at approximately $2.5 million as of January 28, 2010. The parties obviously disagree, however, as to the amount of Mr. Johnson's RCP.

The IRS may reject an OIC because the taxpayer's ability to pay is greater than the amount he proposes to pay under the compromise proposal. See *Fargo v. Commissioner*, 447 F.3d at 709–710. Under IRS procedures, the IRS will not accept a compromise that is less than the reasonable collection value of the case, absent a showing of special circumstances. See Rev. Proc. 2003–71, sec. 4.02(2). Mr. Johnson has not argued that he presents special circumstances, so we determine here whether the settlement officer's calculation of RCP was reasonable. See *Murphy v. Commissioner*, 125 T.C. 301, 302 (2005), affd. 469 F.3d 27 (1st Cir. 2006).

C. *Dissipated assets*

Where the settlement officer determines that a taxpayer has dissipated assets in disregard of the taxpayer's outstanding Federal income tax liability, the IRM[12] provides that the dissipated assets may be included in the calculation of the minimum amount that is to be paid under an acceptable OIC:

(1) During an offer investigation it may be discovered that assets (liquid or non liquid) have been sold, gifted, transferred, or spent on non-priority items or debts and are no longer available to pay the tax liability. This section discusses treatment of the value of these assets when considering an OIC.

* * * * * * *

(2) Once it is determined that a specific asset has been dissipated, the investigation should address whether the value of the asset, or a portion of the value, should be included in an acceptable offer amount.

(3) Inclusion of the value of dissipated assets must clearly be justified in the case file and documented on the ICS or AOIC history, as appropriate. A determination that assets were dissipated should include an analysis of the following facts:

- When the asset(s) were dissipated in relation to the offer submission.
- When the asset(s) were dissipated in relation to the liability.
- How the asset was transferred.
- If the taxpayer realized any funds from the transfer of assets.

---

[12] The IRM provisions on dissipated assets were revised in October 2010 and since then appear in part 5.8.5.16, but we quote the provisions as in effect when the Office of Appeals made the determination under review here. Mr. Johnson asserts in his brief that the IRM instructs settlement officers to take dissipated assets into account "only in unusual circumstances." The IRM, however, does not require "unusual circumstances" but requires only that the inclusion of dissipated assets "must clearly be justified." IRM pt. 5.8.5.5(3) (Sept. 23, 2008). The IRM, quoted below, goes on to list a number of factors for consideration in deciding whether to include the value of dissipated assets in a taxpayer's RCP as quoted above.

- How any funds realized from the disposition of assets were used.
- The value of the assets and the taxpayer's interest in those assets.

\* \* \* \* \* \* \*

(5) If the investigation clearly reveals that assets have been dissipated with a disregard of the outstanding tax liability, consider including the value in the RCP calculation.

  [IRM pt. 5.8.5.5 (Sept. 23, 2008).]

A dissipated asset is thus defined as any asset (liquid or non-liquid) that has been sold, transferred, or spent on non-priority items or debts and that is no longer available to pay the tax liability. IRM pt. 5.8.5.5(1); see also *Samuel v. Commissioner*, T.C. Memo. 2007–312. If the taxpayer establishes that he used the dissipated assets for necessary living expenses, the IRM instructs the settlement officer not to include them in the RCP calculation. IRM pt. 5.8.5.5(4). If the taxpayer fails to provide information substantiating the disposition of the funds from such assets, the settlement officer may consider including the full value of the dissipated assets as part of the taxpayer's RCP, for purposes of determining an acceptable offer amount. IRM pt. 5.8.5.5(8).

  A consequence of including dissipated assets in RCP is that the taxpayer is fictitiously assumed to have, as funds available to pay his tax liability, money that he manifestly does not have anymore—an assumption that may be discouraging to the delinquent taxpayer who is trying to get right with the IRS. However, the evident reason for this rule is to deter delinquent taxpayers from wasting money that they owe and should pay as taxes. Conscientious taxpayers would object—and the system would suffer—if a taxpayer with overdue taxes and with money in hand could spend his money on "non-priority items" and nonetheless effectively obtain forgiveness of his liability simply by proving in the collection context that he really did reduce his collection potential by wasting the assets. Removing dissipated assets from RCP could create perverse incentives, and the tax collector must have discretion to avoid that problem. It is therefore reasonable for the Office of Appeals to consider including dissipated assets in a taxpayer's RCP.

D. *Judicial review*

If the taxpayer is dissatisfied with the determination made by the Office of Appeals in his CDP hearing, he may appeal that determination by filing a petition in this Court. Sec. 6330(d). Where, as here, the underlying tax liability is not at issue, our review of the notice of determination under section 6330 is for abuse of discretion. See *Sego v. Commissioner*, 114 T.C. 604, 610, (2000); *Goza v. Commissioner*, 114 T.C. 176, 182, (2000). We do not make an independent decision as to what would be an acceptable OIC or substitute our judgment for that of the settlement officer. Rather, we do not disturb the IRS's decision to reject an OIC unless it is arbitrary, capricious, or without sound basis in fact or law. *Murphy v. Commissioner*, 125 T.C. at 320. [13]

## II. *Non-acceptance of the December 24, 2008, OIC*

For two reasons, we hold that when in January 2009 the Office of Appeals declined to accept Mr. Johnson's December 24, 2008, OIC offering $400,000, it did not abuse its discretion:

### A. *Mr. Johnson amended or withdrew the December 24, 2008, OIC in April 2009*.

The regulations require that OICs be submitted "in the form and manner * * * prescribed by the Secretary". 26 C.F.R. sec. 301.7122–1(d)(1). The prescribed form for an OIC is Form 656. See 26 C.F.R. sec. 601.203(b), Statement of Procedural Rules; Rev. Proc. 2003–71, sec. 4.01, 2003–2 C.B. at 517. Mr. Johnson's latest Form 656 was submitted in December 2008 and contained his offer to pay $400,000. When respondent moved the Court (with Mr. Johnson's consent) to remand this case to the Office of Appeals, respondent apparently assumed that Mr. Johnson's December 24, 2008, OIC had still been pending at the time of the original April 17, 2009, determination. [14] However, it is clear that the

---

[13] Mr. Johnson requests that this Court "order that petitioner's pending offer in compromise be accepted by respondent"; however, this Court has jurisdiction to review respondent's rejection of an OIC for abuse of discretion. We cannot order the IRS to accept an OIC. Rather, if we find that the IRS abused its discretion in rejecting an OIC, the remedy available to this Court is to determine that the collection action itself—the filing of the NFTL or the proposed levy—is not sustained.

[14] Respondent's motion for remand filed December 14, 2009, stated: "The primary issue in this

December 24, 2008, OIC was either amended or withdrawn by the time the Office of Appeals made its original determination and could not have been accepted by the IRS at that time.

1. *The December 24, 2008, OIC was amended in April 2009*.

In a letter dated April 10, 2009, Mr. Johnson's representatives stated:

Mr. Johnson * * * is no longer able to make the payments required under the $400,000 offer. * * * Mr. Johnson has instructed us to amend the pending $400,000 offer downward to $140,000, consisting of the $80,000 he has already paid to the IRS and the estimated $60,000 sale value of his remaining interest in Doll [DCM].

* * * * * * *

* * * We respectfully request * * * that Mr. Johnson's offer as revised herein be accepted by the IRS.

In a letter dated March 12, 2010, Mr. Johnson's representatives confirmed to SO Covey that Mr. Johnson's "current offer in compromise * * * totals $140,000".

We find no provision in the pertinent regulations or Revenue Procedure that precludes an amendment to an OIC or requires that such an amendment take any particular form. Consequently, we conclude that on April 10, 2009, Mr. Johnson's latest OIC was amended downward by $260,000 [15] to an amount of $140,000. As a result of that amendment, there was no longer pending thereafter any offer to pay $400,000. Therefore, the Office of Appeals did not abuse its discretion by failing to accept payment of $400,000.

---

case is whether respondent's Office of Appeals abused its discretion in rejecting, as a collection alternative, a proposed offer-in-compromise. * * * The Notice of Determination, however, does not provide an explanation as to how the Office of Appeals calculated petitioner's reasonable collection potential". This suggests that respondent believed Mr. Johnson's December 24, 2008, OIC was still pending and had not been withdrawn. Otherwise respondent need only have issued a notice of determination stating that the December 24, 2008, offer had been withdrawn, rather than asking for a remand to clarify the calculation of Mr. Johnson's RCP for an offer that respondent knew was no longer pending.

[15] The attachment to the supplemental notice of determination misstates Mr. Johnson's proposal at one point by stating, "your proposal was decreased from $400,000 *to $260,000*". (Emphasis added.) But in fact the offered amount was decreased *by* $260,000 *to $140,000*, as the attachment elsewhere acknowledges.

2. *If the December 24, 2008, OIC was not amended, then it was withdrawn.*

Mr. Johnson's representatives' April 2009 letter made it clear that his payment of $400,000 was no longer possible and was not offered. If the letter did not effectively amend the offer down to $120,000, then it must have withdrawn the offer of $400,000. An offer will be considered withdrawn on the IRS's receipt of written notification of the withdrawal of the offer either by personal delivery or certified mail, or on issuance of a letter by the IRS confirming the taxpayer's intent to withdraw the offer. 26 C.F.R. sec. 301.7122–1(d)(3); Rev. Proc. 2003–71, sec. 7.02, 2003–2 C.B. at 519. While Mr. Johnson's representatives' letter did not use the term "withdraw", it stated that "the $400,000 offer is no longer workable" because Mr. Johnson "is no longer able to make the payments". If the letter withdrew the OIC, then the Office of Appeals did not abuse its discretion in failing to accept the then-obsolete December 24, 2008, OIC.

B. *An OIC offering $400,000 would have been defective.*

Even if Mr. Johnson's offer to pay $400,000 had still been pending, the Office of Appeals would not have abused its discretion by failing to accept that offer when it issued its supplemental determination in April 2010. This is so for one of two alternative reasons: First, Mr. Johnson had stated that he could not afford to make the payments that the $400,000 OIC called for. If that were true, then he would default on his obligations under the OIC and, under the standard term in paragraph *l* of Form 656, would again become liable for the entire liability. The execution of the OIC would have been a pointless act. Or, second, for the reasons stated below in part III.B.2, SO Covey reasonably concluded that Mr. Johnson's RCP exceeded $400,000. That being the case, it would not have been in the Government's interest to accept the OIC, and the Office of Appeals would not have abused its discretion by declining to accept it.

However, the only collection alternative pending during the supplemental hearing was the amended offer of $140,000 (i.e., Mr. Johnson's offer to pay $60,000, in addition to the $80,000 already remitted to the IRS). We now analyze that proposal.

III. *Non-acceptance of the informal proposal*

A. *Mr. Johnson's informal proposal was pending*.

As we have noted, IRS regulations require that an OIC be submitted on a Form 656, whereas Mr. Johnson's latest and only pending proposal was the $140,000 proposal communicated by letter of April 10, 2009 (and confirmed by letter of March 12, 2010). However, for the reasons stated above in part II.A.1, the April 2009 letter amended the December 24, 2008, OIC, so that the $140,000 proposal was pending in the form of the amended OIC. But even if the $140,000 proposal was *not* embodied in a formal OIC, it was nonetheless a "collection alternative" for purposes of section 6330(c)(2)(A)(iii) and was properly considered during the CDP hearing. See *Sullivan v. Commissioner*, T.C. Memo. 2009–4, 97 TCM (CCH) 1010, 1016 (2009).

B. *Mr. Johnson's informal proposal was inadequate*.

1. *The issue: Did Mr. Johnson's RCP exceed $60,000?*

We hold that the Office of Appeals did not abuse its discretion in declining Mr. Johnson's proposal to compromise his unpaid Federal income tax liabilities for $140,000. That proposed amount consisted of $80,000 that Mr. Johnson had already deposited in connection with prior offers and an additional $60,000. Thus, Mr. Johnson essentially offered an additional $60,000 in settlement of a Federal income tax liability of approximately $2.5 million. This offer assumed that Mr. Johnson's entire collection potential consisted of the value of a single asset that Mr. Johnson owned—his remaining interest in DCM after the second distribution.

To be considered for acceptance, an offer based on doubt as to collectibility must equal or exceed a taxpayer's reasonable collection potential. IRM pt. 5.8.1.1.3(3) (Sept. 23, 2008). Pursuant to Rev. Proc. 2003–71, sec. 4.02(2), an OIC based on doubt as to collectibility will be acceptable only if the offer reflects the taxpayer's RCP, i.e., that amount, less than the full liability, which the IRS could collect through means such as administrative and judicial remedies. *Murphy v. Commissioner*, 125 T.C. at 309.

For SO Covey to properly conclude that Mr. Johnson's proposal should be rejected, she needed only to find that Mr.

Johnson's RCP exceeded $60,000 (i.e., the amount he proposed to pay under his offer). The precise amount by which Mr. Johnson's RCP exceeded $60,000 need not be resolved, because it was sufficient for SO Covey to find that Mr. Johnson had available for collection an amount that was substantially greater than his $60,000 offer.

2. *SO Covey's analysis: Mr. Johnson's RCP exceeded $60,000*.

SO Covey concluded (and we hold that she reasonably concluded) that Mr. Johnson had other assets and disposable income, not admitted by him, that could have funded additional collection. In fact, SO Covey calculated Mr. Johnson's RCP to be not $60,000, but $445,181. However, if Mr. Johnson's RCP did substantially exceed $60,000, then the rejection of his proposal was justified even if his RCP was not as great as $445,181. We therefore consider three principal items, any one of which by itself would support the supplemental determination of the Office of Appeals.

a. *Dissipated assets*

SO Covey concluded that Mr. Johnson had a total equity in assets of $288,317, which included amounts he had previously received from his Claremont investment and his 2008 DCM distribution, which she considered dissipated assets. Specifically, SO Covey included (a) the $11,317 that Mr. Johnson received from the liquidation of his interest in Claremont and (b) $209,500 from Mr. Johnson's 2008 DCM distribution of $277,000. (The portions of that distribution that she did not treat as dissipation were the $42,500 that was remitted to the IRS as a downpayment with the December 24, 2008, OIC, and $25,000 that was used to pay Mr. Johnson's representatives in connection with the prosecution of his Tax Court proceeding.)

Pursuant to IRM part 5.8.5.5(1), any assets that have been "sold, gifted, transferred, or spent on non-priority items or debts and are no longer available to pay the tax liability" are treated as dissipated assets. The IRM instructs a settlement officer to consider inclusion of dissipated assets, unless the taxpayer can substantiate that such assets were used to fund necessary living expenses. The burden rests on the taxpayer,

however, to provide complete and current financial information and to corroborate any such claims. See *Kerr v. Commissioner*, T.C. Memo. 2007–43; 26 C.F.R sec. 301.7122–1(d)(2).

Mr. Johnson disputes the inclusion of any of his liquidated investments as dissipated assets for purposes of calculating his RCP, because (he says) these funds were reinvested in his failing business, in order to pay him a salary, which he argues was needed for necessary living expenses. If Mr. Johnson could show that he invested these distributions into Asiawerks to pay himself a salary, and if he could substantiate that he used the resulting salary for necessary living expenses, then he could credibly argue that these assets should not be included in his RCP calculation as dissipated assets. However, despite pointed requests from SO Covey, Mr. Johnson failed to substantiate either (a) how much of the 2008 DCM distribution or the Claremont distribution that he invested into Asiawerks was actually used to pay his salary, or (b) how much of this salary, if any, was used for necessary living expenses.[16] Thus SO Covey did not abuse her discretion by including the full $220,817 as dissipated assets in calculating Mr. Johnson's RCP.

b. *Personal bank accounts*

SO Covey determined from Mr. Johnson's own financial statements that he held $7,500 in bank accounts (an amount equal to more than 10 percent of the $60,000 he offered). Mr. Johnson did not dispute this determination. He was therefore in a position to pay substantially more than the $60,000 he offered (which would come from his liquidation of DCM). This fact in itself was enough to justify the rejection of his $140,000 proposal.

c. *Future disposable income*

According to the IRM, the amount to be collected from future income, for purposes of calculating a taxpayer's RCP, consists of projected gross monthly income, less allowable expenses, forecast over a specified monthly period. IRM pt. 5.8.5.6. In calculating future income, settlement officers are

---

[16] According to his 2008 Form W–2, Mr. Johnson received $79,500 as tribal income. Since he had at least this tribal income from which to pay living expenses, we cannot assume that Asiawerks salary was spent on necessary living expenses, which the IRS determined to be $6,509 per month.

directed to consider the taxpayer's "overall general situation including such facts as age, health, marital status, number and age of dependents, level of education or occupational training, and work experience". *Id.* pt. 5.8.5.6(2). If a taxpayer is temporarily unemployed or underemployed, the IRM suggests using "the level of income expected if the taxpayer were fully employed and if the potential for employment is apparent." *Id.* pt. 5.8.5.6(5).

In this case, SO Covey calculated Mr. Johnson's future disposable income to be $9,777 in projected gross monthly income, less $6,509 in allowable monthly expenses, arriving at $3,268 in disposable income per month, which she projected over a period of 48 months.[17] Mr. Johnson makes two principal arguments against SO Covey's determination of disposable income—first, that income should be reduced and, second, that his allowable expense should be increased.

First, Mr. Johnson argues that he should essentially be treated as having no future income potential at all and that the Office of Appeals should apply a "flexible" standard in projecting his monthly income, given that Mr. Johnson's business, Asiawerks, is now defunct. In their letter dated March 12, 2010, Mr. Johnson's representatives essentially argue that he has no prospect of future income, other than his tribal income, because Asiawerks was in the process of winding up. This argument, however, overlooks the significant difference between being temporarily unemployed or underemployed and being permanently unemployable. In considering the factors outlined in the IRM, including Mr. Johnson's health, education, skills, prior earnings, and professional background, SO Covey did not abuse her discretion in finding that Mr. Johnson was very employable and could, at a minimum, earn a projected $39,000 a year, in addition to his tribal income.

Second, Mr. Johnson argues that his disposable income should be reduced by loan payments of $3,000 per month. This purported expense stems from a home equity loan that his mother took out on her home, the proceeds of which he claims were used by him for living expenses, the payment of taxes, and legal fees incurred in connection with this pro-

---

[17] In an exercise of discretion, SO Covey projected Mr. Johnson's gross monthly income over a period of only 48 months, even though, according to IRM part 5.8.5.6(1)(A), she could have projected his income over 60 months.

ceeding. While SO Hunt proposed to allow the monthly loan payments as an expense in the calculation of Mr. Johnson's RCP, and while SO DeVincentz would have allowed a portion of these loan payments, the administrative record reflects that the Office of Appeals was justified in ultimately disallowing the $3,000 monthly loan payments on SO Covey's recommendation, because Mr. Johnson failed to establish that the payment of this debt was "necessary for the production of income or for the health and welfare of the taxpayer's family," as required by the IRM. See IRM pt. 5.8.5.6.2(1). A more difficult issue might have been presented had Mr. Johnson corroborated his claim that the loan proceeds were applied toward his outstanding tax liabilities; however, we need not address that hypothetical issue. In the absence of any evidence to substantiate his claims that the loan proceeds were used for necessary living expenses or the payment of taxes and expenses, we cannot say that SO Covey abused her discretion by disallowing the $3,000 monthly loan payments in calculating Mr. Johnson's RCP.

Thus, while Mr. Johnson proposed to pay the IRS the proceeds from the anticipated sale of one asset and nothing more, SO Covey reasonably determined, in view of his professional qualifications and personal earning history, that his reasonable collection potential included some amount of future disposable income. That being the case, rejection of his proposal was not an abuse of discretion.

C. *Mr. Johnson's other arguments have no merit.*

1. *The Office of Appeals did not renege on any deal with Mr. Johnson.*

Mr. Johnson claims in his answering brief that his OICs were accepted by the IRS four times over the last seven years, but each time the IRS subsequently reneged on the deals. Mr. Johnson argues that the administrative course of conduct was therefore more intrusive than necessary and denied him the fundamental fairness that Congress sought to protect in CDP hearings. Mr. Johnson's claim fails, however, as a matter of both fact and law.

a. *As a matter of fact, no settlement officer purported to accept any offer made by Mr. Johnson.*

The record is altogether void of any instance in which a settlement officer or Appeals officer purported to actually accept any of Mr. Johnson's OICs. While SO Hunt *recommended* acceptance of Mr. Johnson's December 24, 2008, OIC in the draft January 2009 ACM, this recommendation was considered by SO Hunt's manager, Ms. Craca, and ultimately rejected. A recommendation of acceptance by a settlement officer, however, is not an acceptance of a taxpayer's OIC.

b. *As a matter of law, no settlement officer had any authority to accept any offer made by Mr. Johnson.*

An OIC is a contract, and general principles of contract law therefore determine whether a binding settlement has been reached. *Becker Holding Corp. v. Commissioner*, T.C. Memo. 2004–58. One such principle is that a settlement agreement may be reached only by authorized agents or officials representing the parties. *Dorchester Indus. Inc. v. Commissioner*, 108 T.C. 320, 331 (1997), affd. without published opinion 208 F.3d 205 (3d Cir. 2000). "[P]ersons dealing with an agent of the government must take notice of the limitations of his authority." *Bornstein v. United States*, 345 F.2d 558, 562 (Ct. Cl. 1956); *Graff v. Commissioner*, 74 T.C. 743 (1980), affd. per curiam 673 F.2d 784 (5th Cir. 1982); *Midwest Motor Express, Inc. v. Commissioner*, 27 T.C. 167, 182 (1956), affd. 251 F.2d 405 (8th Cir. 1958). Within the Office of Appeals, final authority over administrative settlements involving Federal tax matters has been delegated to Regional Directors of Appeals, Chiefs, Assistant Chiefs and Associate Chiefs of the Appeals Offices, Appeals Team Chiefs, Team Managers, Directors of an Appeals Operating Unit, Appeals Area Directors, Deputy Appeals Area Directors, and Appeals Team Case Leaders. 26 C.F.R. sec. 601.106(a)(1)(i) and (ii), Statement of Procedural Rules; IRS Deleg. Order No. 66 (Rev. 15 Jan. 23, 1992). IRS Deleg. Order No. App. 8–a (Mar. 17, 2003) further authorizes: (1) Appeals officers and settlement officers to conduct hearings and make determinations under secs. 6320 and 6330; and (2) Appeals Team Managers to review and approve such determinations. Thus, a settlement officer lacks authority to accept an OIC. Consequently,

regardless of any action that SO Hunt might have purported to take, the Government had not accepted any OIC that could have been breached by the adverse determinations of the Office of Appeals.

The outcome is the same if Mr. Johnson contends not that an OIC was explicitly accepted by SO Hunt but that in some other, less formal fashion SO Hunt made a deal with him on behalf of the IRS. Such a contention alleges a quasi-contract, or a contract implied in fact, which is "'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Lewis v. United States*, 70 F.3d 597, 600 (Fed. Cir. 1995) (quoting *Baltimore & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597 (1923)). However, as the Court of Federal Claims has explained,

[W]hen the United States is a party to an alleged contract implied-in-fact, the government representative "whose conduct is relied upon must have actual authority to bind the government in contract." [*Minehan v. United States*, 75 Fed. Cl. 249, 260 (2007); citations omitted.]

The Commissioner is thus not bound by an apparent settlement where an agent is without authority to compromise a taxpayer's tax liability. *Becker Holding Corp. v. Commissioner*, T.C. Memo. 2004–58, 87 TCM (CCH) 1069, 1071 (2004) (citing *Botany Worsted Mills v. United States*, 278 U.S. 282, 288–289 (1929)). Here, SO Hunt was without authority to bind respondent to a settlement, and thus Mr. Johnson could not have had any deal based on the actions of SO Hunt.

### 2. *The Office of Appeals did not abuse its discretion by delay in the handling of Mr. Johnson's case.*

Mr. Johnson also asserts in his briefs that the CDP proceedings were "more intrusive than necessary", in violation of section 6330(c)(3)(C), because of the length of the proceedings and the number of settlement officers assigned to his hearings. While the four-year duration of this proceeding was unfortunate, we do not perceive that the Office of Appeals abused its discretion in conducting the CDP hearings.

First, section 6330(c)(3)(C) does not provide that the CDP process must not be "more intrusive than necessary", but rather that the proposed "collection action [e.g., lien or levy]

be no more intrusive than necessary." Mr. Johnson has made no showing that the collection actions that the Office of Appeals sustained were unduly intrusive.

Second, the long duration of Mr. Johnson's CDP hearing was largely attributable to Mr. Johnson. His case presented a moving target, as his financial affairs drastically fluctuated, with the liquidation of his investments and the failing of Asiawerks. In addition, Mr. Johnson delayed providing the necessary financial records that were requested of him by various settlement officers (many of which records he never provided).

Personnel in the Office of Appeals cannot be chained to their cases. The work of that office, like the work in any office, will have to be reassigned as time passes, when employees take leave, receive promotions, or retire. And when reassignments do occur, new personnel will necessarily take time to get up to speed. We do not find that the Office of Appeals protracted Mr. Johnson's proceedings in a manner that could constitute an abuse of discretion.

## Conclusion

The determination of the IRS's Office of Appeals—i.e., not to accept Mr. Johnson's proposed collection alternative, but instead to sustain the filing of the notice of lien and the proposed collection by levy of his outstanding tax liabilities— was not an abuse of discretion. Respondent may proceed with collection.

To reflect the foregoing,

*Decision will be entered for respondent.*