T.C. Memo. 2012-12

UNITED STATES TAX COURT

DARRELL L. AND VICKY L. TITSWORTH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20452-09L.                    Filed January 11, 2012.

Darrell L. Titsworth and Vicky L. Titsworth, pro sese.

<u>Britton G. Wilson</u>, for respondent.

MEMORANDUM OPINION

LARO, <u>Judge</u>:  This collection case was submitted to the
Court for decision without trial.  See Rule 122.[1]  Petitioners
Darell L. Titsworth (Mr. Titsworth) and Vicky L. Titsworth (Ms.

[1]Unless otherwise indicated, section references are to the
Internal Revenue Code, and Rule references are to the Tax Court
Rules of Practice and Procedure.  Dollar amounts are rounded.

Titsworth) petitioned the Court to review the determination of respondent's Office of Appeals (Appeals) sustaining a proposed levy upon their property.  See sec. 6330(d)(1).  Respondent sought the levy to collect from petitioners approximately $33,652 of unpaid Federal income tax liabilities for 2001, 2002, 2005, and 2006 (subject years).[2]  We decide whether Appeals abused its discretion in rejecting petitioners' $500 offer to compromise $33,652 of Federal income tax liabilities.  We hold it did not.

## Background

The facts in this background section are obtained from the parties' stipulation of facts and the accompanying exhibits.  We incorporate the stipulated facts and the exhibits herein by this reference, and we find the stipulated facts accordingly.

## I.  Petitioners

Petitioners are husband and wife who resided in Arkansas when their petition was filed.  They have at least one son, N.T. At all relevant times, Mr. Titsworth operated a real estate rental and appraisal business as a sole proprietor.  He also served as a member of the board of directors of the Cisero Place Hunting Club (Cisero).  Petitioners are good friends with Robert Lawry (Mr. Lawry) and Patricia Lawry (collectively, Lawrys). Since 1984, petitioners have relied upon the Lawrys for real

_____

[2]We use the term "approximately" because this amount was computed before this proceeding and has since increased on account of interest.

estate financing, principally in the form of purchase money mortgages (Lawry mortgages).

II. Nonpayment of Taxes and Final Levy Notices

Petitioners filed Federal income tax returns late for the subject years but did not pay the reported tax liabilities. On July 28, 2008, respondent issued to each petitioner a separate Final Notice of Intent to Levy and Notice of Your Right to a Hearing (final levy notices). The final levy notices advised petitioners that respondent intended to levy upon their property to collect $33,652 of Federal income tax liabilities for the subject years. The final levy notices also informed petitioners that they could appeal the proposed levy by requesting a collection due process (CDP) hearing with Appeals. On August 20, 2008, in response to the final levy notices, petitioners' representative submitted Form 12153, Request for a Collection Due Process or Equivalent Hearing, indicating their intention to submit an offer-in-compromise as a collection alternative to the proposed levy.

III. Offer-in-Compromise Submission

On August 27, 2008, petitioners submitted a Form 656, Offer in Compromise, based on doubt as to collectibility and offered to pay $500 in a lump sum to compromise their unpaid Federal income tax liabilities for the subject years and 2003, 2004, and 2007. In support of their offer, petitioners provided a Form 433-A,

Collection Information Statement for Wage Earners and Self-Employed Individuals, a Form 433-B, Collection Information Statement for Businesses, for Cisero, and supporting documents.

The Form 433-A reported personal assets including, among other things, cash of $1,700, two personal bank accounts totaling $6,746, four automobiles, three "4 wheeler" vehicles (ATVs), one camper, one tractor, and the following real property:

| Description | Reported Fair Market Value | Reported First Mortgage | Reported Second Mortgage[1] | Reported Equity |
|---|---|---|---|---|
| 1162 Hwy 71S | $181,550 | $161,221 | $56,477 | ($36,148) |
| 116 Polk 703 | 80,000 | 79,521 | -0- | 479 |
| 141 Carter Creek | 23,050 | -0- | -0- | 23,050 |
| 561 Hwy 375 | 39,150 | 15,071 | 43,567 | (19,488) |
| 3245 Hwy 71N | 68,850 | 65,099 | -0- | 3,751 |
| Hwy 71 back lot | 9,600 | [1]29,728 | -0- | (20,128) |
| Harfield property | 3,500 | 5,500 | -0- | (2,000) |
| 149 Carter Creek | 17,000 | 9,720 | 21,711 | 14,431 |
| Total | 422,700 | 365,860 | 121,755 | [2](65,873) |

[1]All second mortgages and the first mortgage on the property described as "Hwy 71 back lot" were reportedly held by the Lawrys.

[2]We observe that the total reported equity does not equal the total reported fair market value less total reported mortgages.

The Form 433-A also listed two business bank accounts (held in petitioners' names) totaling $3,128, accounts/notes receivable totaling $2,997, and various assets which petitioners claimed to be valued at $2,600 after encumbrances. Petitioners reported monthly net business income from Mr. Titsworth's business as $2,894. Finally, the Form 433-A reported petitioners' monthly income as $4,985 and their monthly living expenses as $5,065. The Form 433-B reported that Cisero had zero assets, zero income, zero expenses, and zero employees.

IV.  Exchange of Information

Petitioners' hearing request was initially assigned to the Memphis, Tennessee, Appeals Office.  In a letter dated October 26, 2008, respondent acknowledged receiving petitioners' offer-in-compromise but stated that the offer could not be evaluated until petitioners submitted bank statements for all personal and business accounts and documents substantiating their business income.  Petitioners responded to that letter with a collection of bank and credit card statements, receipts, and invoices.

Appeals transferred petitioners' hearing request to its office in Oklahoma City, Oklahoma, on or about February 4, 2009.  Settlement Officer M. Kathy Howe (SO Howe) was assigned to conduct that hearing.  In a letter dated March 25, 2009, SO Howe scheduled a hearing with petitioners by telephone.  That letter requested that petitioners submit, among other items, (1) copies of mortgage loan applications tendered to First National Bank (First National) and the Lawrys, (2) copies of all real estate closing settlement statements for real estate transactions that occurred afer December 31, 2007, and (3) details surrounding petitioners' relationship to the Lawrys.

Petitioners responded to SO Howe's letter with many (but not all) of the items requested.  Included in their submission was a letter that sought to explain petitioners' inability to provide mortgage loan applications.  With respect to the First National

mortgages, petitioners explained that "a written application is not a prerequisite to a loan" in many cases. With respect to the Lawry mortgages, petitioners explained that they did not provide a loan application or financial information to the Lawrys because all business with Mr. Lawry was "sealed on a handshake, although to protect * * * [Mr. Lawry,] we do follow it with filed mortgages". Petitioners were offered a face-to-face CDP hearing but declined.

V.    Evaluation of Offer-in-Compromise

    A.    Overview

    Over a 3-month period, SO Howe collected and analyzed information related to petitioners' assets and income. Among the documents which SO Howe examined were real property records from the Polk County Assessor's Office, mortgages between petitioners and First National or the Lawrys, certain real estate closing settlement statements, and petitioners' attempted explanation of the encumbrances on their real property. SO Howe also reviewed reports from third parties detailing petitioners' real estate holdings, check registers, and bank records and statements. By and large, her research revealed a number of inconsistencies between what petitioners actually owned and what they claimed to own on the Form 433-A.

    SO Howe's analysis was detailed, and she summarized her findings in an Appeals Case Memorandum (memorandum). She noted

that the calculation of petitioners' reasonable collection potential (RCP) "likely" contained errors, but stated that an accurate analysis was not possible because (1) petitioners failed to provide documents requested or fully disclose assets, and (2) Mr. Titsworth continued to engage in real estate transactions. SO Howe also noted that petitioners failed to disclose assets for which they claimed depreciation deductions on the returns for the subject years. SO Howe observed that, notwithstanding the errors in the memorandum, she was able to determine that petitioners had the ability to fully pay their unpaid Federal income taxes.

The memorandum served as the analysis for SO Howe's determination that petitioners' offer-in-compromise should be rejected, and it was incorporated directly into the notice of determination on which this case is based. The memorandum included an "Asset/Equity Table" which calculated petitioners' RCP on the basis of their available equity in assets and their future income potential.

B. <u>Total Asset Equity</u>

SO Howe first determined petitioners' total asset equity as follows:

| Assets | Fair Market Value | Quick Sale Value | Encumbrances | Equity |
|---|---|---|---|---|
| Cash | $1,700 | $1,700 | -0- | $1,700 |
| Checking accounts | 4,172 | 4,172 | -0- | 4,172 |
| Savings accounts | 44 | 44 | -0- | 44 |
| Mobile home | 15,000 | 12,000 | -0- | 12,000 |

| | | | | |
|---|---|---|---|---|
| Irrigation system | 500 | 400 | -0- | 400 |
| Equipment | 500 | 400 | -0- | 400 |
| Trailers | 9,600 | 7,680 | $5,873 | 1,807 |
| Tractors and ATVs | 17,275 | 13,820 | 6,822 | 6,998 |
| 1999 Buick Century | 2,400 | 1,920 | 4,198 | -0- |
| 2000 Toyota Tundra | 2,440 | 1,920 | -0- | 1,920 |
| 2003 Chevy Tahoe | 10,815 | 8,652 | -0- | 8,652 |
| 2004 GMC Sierra | 7,065 | 5,652 | 9,343 | -0- |
| 2006 dirt bike | 3,610 | 2,888 | 2,047 | 841 |
| Household goods | 6,000 | 4,800 | 4,800 | -0- |
| Business equipment and furniture | 4,000 | 3,200 | 3,200 | -0- |
| Cisero | -0- | -0- | -0- | -0- |
| Real estate: | | | | |
| 116 Polk 703 | 80,000 | -0- | 79,485 | 80,000 |
| 116 Polk 41 | 53,000 | 42,400 | -0- | 42,400 |
| 242 Polk 46 | 75,000 | 60,000 | Unknown | 60,000 |
| 104 Oak Forest Lane | 148,000 | 148,000 | ([1]) | -0- |
| Pt W 1/2 SE | 15,743 | -0- | -0- | 15,743 |
| Holiday apartments | 207,227 | 165,782 | -0- | 165,782 |
| Residential rental (Acorn, AR) | 57,600 | 46,000 | Unknown | 46,000 |
| Land Hatfield | 500 | 500 | -0- | 500 |
| 141 Carter Creek | 35,950 | 28,760 | -0- | 28,760 |
| 149 Carter Creek | -0- | -0- | 31,699 | -0- |
| 1162 Highway 71S | 195,000 | 156,000 | 215,923 | -0- |
| Hwy 71 (back lot) | 9,600 | 7,680 | 29,728 | 7,680 |
| 3245 Highway 71N | 90,000 | 72,000 | 65,331 | 6,669 |
| 561 Hwy 375E | 45,600 | 36,480 | 15,071 | 21,409 |
| 1810 Wertz | 73,600 | 58,880 | Unknown | 58,880 |
| Wickes land | 697 | 697 | -0- | 697 |
| Total asset equity[2] | | | | 573,461 |

[1]A note within the table stated that petitioners satisfied a first mortgage of $131,492 and received a 1998 mobile home which was separately included in the table.

[2]We observe that the sum of the items does not equal total asset equity.

Included in the total asset equity were "dissipated equity funds" of $150,007, which we understand to refer to dissipated assets. SO Howe determined that petitioners dissipated assets by conveying mortgages to the Lawrys on five of their properties to allegedly borrow $150,007. SO Howe concluded that the Lawry mortgages were "sham mortgages" intended to cloud title to petitioners' properties.

As support for her conclusion, SO Howe noted that proceeds from the Lawry mortgages were not used to settle prior mortgages (in the case of a refinancing), or that no money exchanged hands (in the case of a cashout).  SO Howe also observed that the Lawrys were not mortgage lenders, that they never issued petitioners a Form 1098, Mortgage Interest Statement, and that they received only one $1,500 payment from petitioners over the course of several months in 2008.[3]  Thus, SO Howe treated the proceeds from the Lawry mortgages as dissipated assets and calculated the available equity in petitioners' assets without regard to the Lawry mortgages.

In particular, SO Howe determined petitioners' dissipated assets as follows:

| Description[1] | Encumbrance | Dissipated Value |
|---|---|---|
| 1162 Hwy. 71S | $56,477 | $56,447 |
| 149 Carter Creek | 21,712 | 21,712 |
| 141 Carter Creek | 14,892 | 14,892 |
| 141 Carter Creek back lot | 29,046 | 29,046 |
| 561 Hwy. 375E | 27,881 | 27,881 |
| Total[2] | 150,007 | 150,007 |

[1]The memorandum described the properties by a variation of the metes and bounds description.  We compared that description with other documents in the record to determine a less cumbersome description of the property.

[2]The sum of the items does not equal the total because of rounding.

---

[3]We note that petitioners' bank records establish that they paid Mr. Lawry $1,500 by check on each of Aug. 12, Sept. 24, and Oct. 14, 2008.

The record is not clear whether the property described as "141 Carter Creek back lot" is the same property which petitioners described on the Form 433-A as "Hwy 71 back lot".

C.   Future Income Potential

SO Howe next calculated petitioners' future income potential over the 10-year statutory collection period.  See sec. 6502(a). She first determined petitioners' monthly disposable income (i.e., total income less total allowable expenses) as follows:

| Income and Expense | As Claimed | As Determined |
|---|---|---|
| Income: | | |
| Gross wages | $2,894 | -0- |
| Rental income | -0- | -0- |
| Interest/rental income | -0- | $305 |
| Business income | -0- | 2,393 |
| Pension/Social Security benefits | 1,326 | 1,326 |
| N.T.'s Social Security benefits | 765 | 765 |
| Installment sale income | -0- | 776 |
| Total income | 4,985 | 5,565 |
| Expenses: | | |
| National standard | 1,151 | 1,152 |
| Housing and utilities | 879 | 895 |
| Automobile payment (Tundra) | 489 | 200 |
| Automobile payment (Chevy) | 489 | 200 |
| Automobile operating costs | 456 | 402 |
| Health insurance | 612 | 516 |
| Out of pocket medical expenses | 424 | 240 |
| Income taxes | 363 | 465 |
| Life insurance | 202 | 202 |
| Total expenses | 5,065 | 4,272 |
| Monthly disposable income | (80) | 1,293 |

SO Howe then bifurcated petitioners' future income into two tranches; the first included N.T.'s Social Security benefits, and the second omitted them.  SO Howe determined that bifurcation was

necessary because N.T.'s benefits ceased when he turned 19 years old (he was apparently 17 years old when petitioners submitted their offer-in-compromise).[4]  SO Howe computed petitioners' future income during the 2-year period in which N.T. received Social Security benefits as $31,032 ($1,293 times 24 months).  SO Howe determined petitioners' future income during the remaining 88-month period to be $46,464 (($1,293 less N.T.'s Social Security benefits of $765) times 88 months).  Finally, SO Howe calculated petitioners' future income as $77,496 ($31,032 plus $46,464).[5]

D.  RCP and Rejection of Offer-in-Compromise

SO Howe determined that petitioners' RCP was $650,957, calculated as total asset equity of $573,461 plus future income of $77,496.  As documented in the memorandum, SO Howe determined that petitioners did not qualify for an offer-in-compromise for three reasons.  First, SO Howe stated that petitioners had sufficient equity to pay their taxes in full.  Second, SO Howe stated that petitioners had the ability to pay their taxes in full through an installment agreement.  Third, SO Howe stated that petitioners failed to provide all documentation necessary

---

[4]The record does not specify N.T.'s birthday or the date that he graduated from high school.

[5]SO Howe did not determine an increased ability to pay from the retirement of debt, nor was she required to.  See Internal Revenue Manual (IRM), pt. 5.8.5.6(3) and (4) (Sept. 23, 2008). We observe that this determination was favorable to petitioners.

for an investigation of the offer-in-compromise.  She recommended that petitioners' offer-in-compromise be rejected because the amount offered ($500) was less than petitioners' RCP ($650,957).

VI.  Notice of Determination

On July 30, 2009, Appeals issued to petitioners a notice of determination sustaining the proposed levy action because Appeals determined that petitioners could pay their taxes in full through the liquidation of assets and their future ability to pay.  The notice of determination documented the steps taken to verify that legal and administrative requirements had been met and balanced the need for efficient collection of taxes with petitioners' concerns of intrusiveness.  The notice of determination also considered petitioners' offer-in-compromise and addressed those issues by, among other things, including the memorandum in unchanged form.

VII. Other Federal Income Tax Reporting

Petitioners filed joint Federal income tax returns for 2007 and 2008 reporting their total income as follows:

| Item | 2007 | 2008 |
|------|------|------|
| Taxable interest | $6,094 | $5,841 |
| Business income | 49,958 | 28,711 |
| Capital gain | 1,133 | 5,793 |
| Other gains | 18,844 | 4,407 |
| Total rental real estate and royalty income (loss) | (8,405) | (5,807) |
| Farm income (or loss) | (2,501) | -0- |
| Taxable Social Security benefits[1] | 13,224 | 5,980 |

Total Income 78,347 44,925

[1]In 2007 and 2008 petitioners received gross Social Security benefits of $15,558 and $25,097, respectively. We include that portion of the benefits which petitioners reported as taxable on their Federal income tax returns for those years.

Attached to the 2007 and 2008 joint returns were Schedules A, Itemized Deductions, claiming home mortgage interest deductions of $7,690 and $6,447, respectively. Also attached to those returns for Mr. Titsworth's sole proprietorship were Schedules C, Profit or Loss From Business, neither of which claimed a deduction for mortgage interest paid in connection with Mr. Titsworth's business. The 2007 and 2008 joint returns included Forms 6252, Installment Sale Income, reporting that petitioners received installment sale income of $2,038 and $3,487, respectively. Finally, attached to the 2007 joint return was a Form 4797, Sales of Business Property, reporting that petitioners sold three properties during that year for an aggregate gain (gross sale price less adjusted basis) of $18,844.

## Discussion

### I. Overview

The Commissioner may not levy upon a taxpayer's property or property rights unless the taxpayer is notified in writing of his or her right to a hearing under section 6330. Sec. 6330(a)(1). The taxpayer may raise at the hearing any relevant issue relating to the unpaid tax or the proposed levy including collection alternatives such as an offer-in-compromise. Sec. 6330(c)(2)(A).

An Appeals officer is required by statute to consider such issues, see sec. 6330(c)(3), and Appeals sets forth its findings and decisions in a notice of determination, see sec. 301.6330-1(e)(3), Q&A-E8(i), Proced. & Admin. Regs.

Petitioners assert that Appeals was required to let them pay $500 to compromise Federal income tax liabilities of $33,652 on account of doubt as to collectibility. They do not challenge the underlying Federal income tax liabilities assessed against them for the subject years, and we review Appeals' determination for abuse of discretion. See Sego v. Commissioner, 114 T.C. 604, 610 (2000); see also Robinette v. Commissioner, 439 F.3d 455, 459 (8th Cir. 2006), revg. 123 T.C. 85 (2004). Abuse of discretion exists where Appeals rejects an offer-in-compromise "arbitrarily, capriciously, or without sound basis in fact or law." Woodral v. Commissioner, 112 T.C. 19, 23 (1999). A taxpayer generally bears the burden of proving abuse of discretion, see Rule 142(a), and that general rule applies even where, as here, the parties submit their case to the Court fully stipulated, see Rule 122(b).

II.  Petitioners' Offer-in-Compromise

A.  Overview

Section 7122(a) authorizes the Commissioner to compromise a taxpayer's Federal tax liabilities. As authorized by section 7122(d), the Commissioner has developed guidelines for evaluating whether an offer-in-compromise is adequate and should be accepted

to resolve a dispute. See also sec. 301.7122-1, Proced. & Admin. Regs. Under these guidelines, grounds for compromise include (1) doubt as to liability, (2) doubt as to collectibility, and (3) promotion of effective tax administration. See id. Petitioners claim that Appeals was required to accept their offer-in-compromise on the basis of doubt as to collectibility, and we understand them to assert "special circumstances" due to health concerns.

B.    Doubt as to Collectibility

The Commissioner may compromise a tax liability based on doubt as to collectibility where the taxpayer's assets and income are less than the full amount of the unpaid tax liability. Sec. 301.7122-1(b)(2), Proced. & Admin. Regs. An offer to compromise based on doubt as to collectibility will generally be considered acceptable where two conditions are met: First, where it is unlikely that the unpaid tax liability can be collected in full; and second, where the offer reflects the taxpayer's total RCP. See Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. 517. The Internal Revenue Service (IRS) may also accept an offer of less than the total RCP where there are special circumstances such as economic hardship or compelling public policy or equitable considerations. See Murphy v. Commissioner, 125 T.C. 301, 309 (2005), affd. 469 F.3d 27 (1st Cir. 2006); see also sec. 301.7122-1(b)(3)(ii), Proced. & Admin. Regs.

Petitioners cite four grounds in support of their position that SO Howe abused her discretion. First, they assert that SO Howe mistakenly included in their RCP properties which they did not own or double-counted other properties. Second, they contend that SO Howe erred in treating the Lawry mortgages as dissipated assets includible in their RCP. Third, they claim that SO Howe overestimated their future income potential. Fourth, they cite health issues as special circumstances which obliged SO Howe to accept their offer-in-compromise. We consider each of these contentions in turn.

### 1. No Abuse of Discretion as to Property Inclusion

Petitioners contend that SO Howe abused her discretion by crediting petitioners with properties that they did not own or by double-counting properties. We disagree. Preliminarily, we note that with respect to petitioners' real property, the record is riddled with inconsistencies. The Form 433-A reported that petitioners owned 8 properties, but the notice of determination determined that petitioners owned 16 properties. Our review of the record revealed that petitioners, jointly or individually, may have owned as many as 21 properties.[6] The 2007 and 2008

---

[6]The parties submitted a "Custom Comprehensive Report" which was prepared on Oct. 16, 2008, and an undated list of properties which the Polk County Assessor's Office reported petitioners as owning. We counted the properties listed in each report by parcel number and conclude that petitioners, either jointly or individually, owned as many as 21 properties. We do not treat

(continued...)

joint returns reported that petitioners sold real estate or earned rental income from properties which may or may not have been reported on the Form 433-A.[7]  The values which petitioners assigned to properties that they did report conflicted with the market values indicated on the Polk County Tax Assessor's report. Petitioners did not submit to the Court an appraisal for any of the properties in question even though Mr. Titsworth operated a real estate appraisal business.

In the light of these inconsistencies, and bearing in mind that petitioners bear the burden of proof, we decline to conclude that SO Howe abused her discretion.  Respondent's reports showed that petitioners owned more assets than they disclosed to Appeals.  Petitioners failed to disclose their ownership in certain properties, and they provided incomplete and inconsistent information.  The explanations that they provided as to these contradictions were implausible.  Under these circumstances, we must weigh heavily against petitioners, who created the circumstances giving rise to any confusion as to which properties they owned.  See Schropp v. Commissioner, T.C. Memo. 2010-71

---

[6](...continued) petitioners as owning properties that were listed more than once (parcel No. 0000-05111-0120), held in guardianship (parcel No. 0000-6629-0000), or titled in the name of "[Darrell K. and Karen Titsworth]" (parcel Nos. 0000-06131-0000 and 6000-03152-0213), whom we understand to be Mr. Titsworth's son and daughter-in-law.

[7]We decline to reach a conclusion on this point because the record is so fragmented.

(taxpayer's nondisclosure of assets rendered the amount of an offer-in-compromise based on doubt as to collectibility "unquantifiable"), affd. without published opinion 405 Fed. Appx. 800 (4th Cir. 2010); Ashlock v. Commissioner, T.C. Memo. 2008-58 (inconsistent and inconclusive evidence supported the Appeals officer's determination to include the value of dissipated assets in an acceptable offer-in-compromise). We conclude that SO Howe did not abuse her discretion in crediting them with 16 properties because petitioners have failed to persuade us otherwise.

2.  No Abuse of Discretion as to Dissipated Assets

Petitioners believe that Appeals abused its discretion by including $150,007 of dissipated assets in their RCP. We do not. The IRM specifies that dissipated assets include liquid or nonliquid assets that "have been sold, gifted, transferred, or spent on non-priority items or debts and are no longer available to pay the tax liability." Internal Revenue Manual (IRM) pt. 5.8.5.5(1) (Sept. 23, 2008); see also Johnson v. Commissioner, 136 T.C. 475, 487, 492-493 (2011). Appeals officers are instructed to consider including the value of dissipated assets in a taxpayer's RCP unless the taxpayer shows that the dissipated funds had been spent to provide for necessary living expenses. IRM pt. 5.8.5.5(2), (4) (Sept. 23, 2008). Whether to include dissipated assets in a taxpayer's RCP is not an automatic determination but must be evaluated on the basis of the facts and

circumstances of each case in the light of certain enumerated factors.[8]  Id. pt. 5.8.5.5(6).  Finally, Appeals officers are counseled to consider including the value of dissipated funds in an acceptable offer amount where the taxpayer does not provide information showing the disposition of funds from transferred assets.  Id. pt. 5.8.5.5(8).

We conclude that SO Howe did not abuse her discretion when she included $150,007 of dissipated assets in petitioners' RCP, and she was justified in concluding that the Lawry mortgages were suspect.  As petitioners posit, they mortgaged more than $150,000 of real estate without submitting a mortgage application or financial record and without executing a settlement statement.  They claimed to have paid sizable amounts of interest in connection with the Lawry mortgages, but they were not issued (and apparently did not request) a Form 1098.  Nor did they claim mortgage interest deductions on the Schedules C attached to their 2007 and 2008 joint returns.

The Lawry mortgages were not notarized, and they were not signed by either of the Lawrys.  Most of the Lawry mortgages were

---

[8]The factors to be evaluated are (1) when the assets were dissipated in relation to the offer submission, (2) when the assets were dissipated in relation to the liability, (3) how the assets were transferred, (4) whether the taxpayer realized any funds from the transfer of assets, (5) how any funds realized from the disposition of assets were used, and (6) the value of the assets and the taxpayer's interest in those assets.  IRM pt. 5.8.5.5(3) (Sept. 23, 2008).

not recorded until November 2008, more than 10 months after their execution date on January 1, 2008, and approximately 3 months after the offer-in-compromise was submitted on August 27, 2008. Under Arkansas law, the lien of the mortgage did not attach until recordation. See 18 Ark. Code Ann. sec. 18-40-102 (2003); Dempsey v. Merchs. Natl. Bank of Ft. Smith, 729 S.W.2d 150, 151 (Ark. 1987) ("A mortgage becomes a lien at the time it is recorded and not before."). The Lawrys' security interest in the underlying properties was therefore not protected against subsequent purchasers. See Sims v. McFadden, 233 S.W.2d 375, 378 (Ark. 1950). Also peculiar is that petitioners, as mortgagors, would record the Lawry mortgages "to protect" Mr. Lawry.

As if the form, execution, and reporting associated with the Lawry mortgages were not bizarre enough, those mortgages were not necessarily secured. Many of the Lawry mortgages encumbered the underlying properties in excess of petitioners' equity in those properties; we observe that it is atypical behavior for a mortgagee to not secure the note with additional collateral or a guaranty. Petitioners have not explained why the Lawrys would accept mortgages of less than petitioners' equity in the underlying property, and they did not call the Lawrys to testify on that point.[9] Whereas petitioners cite their "small town rural

---

[9]On brief, petitioners direct the Court to exhibits which, they contend, establish that SO Howe erroneously included or
(continued...)

setting" and the "relaxed and less rigid" relationships between bankers and customers as "reasonable explanations" for their lack of formal documentation, we do not. When viewed in the light of petitioners' close personal relationship with the Lawrys, the foregoing facts support SO Howe's conclusion that the Lawry mortgages were dissipated assets that should be included in petitioners' RCP.[10] Petitioners have not persuaded us otherwise.

Even if we agreed with petitioners that their RCP should not have included the value of the Lawry mortgages, which we do not, petitioners are still without recourse. SO Howe reviewed bank statements and determined that petitioners owned cash and bank accounts totaling $5,916 ($1,700 of cash plus $4,172 of checking

---

[9](...continued) double-counted properties in the calculation of their RCP. They also direct the Court to exhibits which, petitioners maintain, evidence valid real estate contracts and mortgages with "Lender". We have tried to review the exhibits which petitioners cite in support of their position but have been unable to do so because those exhibits were identified incorrectly or not included in the record. We note further that petitioners do not specify whether "Lender" refers to the Lawrys, First National, or some other creditor.

[10]By way of an example added to the IRM on Oct. 22, 2010, an Appeals officer should consider including the amount of a second mortgage loan in a taxpayer's RCP where the taxpayer secures a second mortgage on his or her residence, uses a portion of that mortgage to pay unsecured debts, and is unable to account for the remaining loan proceeds. See IRM pt. 5.8.5.16(7) (Oct. 22, 2010). While we are mindful that SO Howe was unable to consider a provision of the IRM not yet existing, we believe that this example bespeaks IRS practice as to when amounts from a second mortgage should be included in a taxpayer's RCP as dissipated assets.

accounts plus $44 of savings accounts). Neither the petition nor petitioners' brief challenges SO Howe's determination of the cash that they owned, and we treat that issue as conceded. See Rule 331(b)(4). Thus, regardless of whether petitioners' RCP included the dissipated assets, the equity component of their RCP exceeded their offer amount with considerable margin.

Moreover, petitioners claim on brief that SO Howe overstated their net worth by approximately $530,459. That statement is, in effect, a concession that the RCP from their assets was $43,102 ($573,561 of asset equity determined by Appeals minus $530,459 overstatement claimed by petitioners). By their own admission, therefore, petitioners possessed sufficient equity ($43,102) to satisfy their unpaid Federal income tax liabilities for the subject years ($33,652).

### 3. No Abuse of Discretion as to Future Income

Petitioners claim in the petition that SO Howe improperly included installment income of $776 per month and N.T.'s Social Security benefits of $765 per month and omitted allowable expenses related to petitioners' Toyota Tundra truck of $200 per month. While we agree with petitioners that SO Howe overstated their future income, we hold those errors harmless because, even as corrected, petitioners' RCP still exceeds their offer. See Lindley v. Commissioner, T.C. Memo. 2006-229, affd. sub nom. Keller v. Commissioner, 568 F.3d 710 (9th Cir. 2009); see also

Keene v. Commissioner, 121 T.C. 8, 21 (2003) (Halpern, J.,
concurring). We consider petitioners' assignments of error
seriatim.

First, we decide whether SO Howe improperly attributed to
petitioners installment income of $776 per month. Attached to
the 2007 and 2008 joint returns were Forms 6252 reporting that
petitioners received installment sale income of $2,038 and
$3,487, respectively. We credit petitioners with amounts
reported on their 2008 return as reflective of their current
income and conclude that petitioners' monthly income includes
installment sale income of $291.

Second, we decide whether SO Howe overestimated the period
during which N.T. received Social Security benefits. Petitioners
claim that they submitted proof to Appeals showing that N.T.'s
Social Security benefits were discontinued in May 2009 when N.T.
graduated from high school. We have parsed the record and, other
than petitioners' statements on brief and in the petition, find
no evidence as to N.T.'s age or when he graduated from high
school. Petitioners' unverified statements are self-serving, and
we need not accept them as truth. See Tokarski v. Commissioner,
87 T.C. 74, 77 (1986). We are mindful that although Social
Security benefits are not typically paid to a child past the age
of 18, such benefits may continue until a child is 19 years old
if that child is a full-time elementary or secondary school

student.  See 42 U.S.C. sec. 402(d)(1)(B) (2006).  Because petitioners have failed to prove when N.T. stopped being a full-time secondary school student, we sustain SO Howe's determination that petitioners' monthly income included N.T.'s Social Security benefits of $765.

Third, we decide whether SO Howe erred in limiting petitioners' automobile expense for the Toyota Tundra vehicle to $200 per month.  The IRM defines future income as "an estimate of the taxpayer's ability to pay based on an analysis of gross income, less necessary living expenses, for a specific number of months into the future."  IRM pt. 5.8.5.6(1) (Sept. 23, 2008).  The number of months for which future income is to be calculated depends upon the payment terms of the offer-in-compromise.  Id. pt. 5.8.5.6(1)(A).  Although SO Howe was authorized to project petitioners' future income over a period of 48 or 60 months, she exercised her discretion to calculate petitioners' monthly income over 112 months.  Id.  We respect that exercise of discretion given that the statutory collection period is 112 months and the offer's payment terms are unknown.  See sec. 6502(a); Johnson v. Commissioner, 136 T.C. at 494 n.17.

In addition to a $402 monthly allowance for automobile operating costs, SO Howe also allowed petitioners $200 per month for the duration of the future income period for each of the Toyota Tundra and the Chevy Tahoe automobiles.  That adjustment

was in accordance with respondent's administrative guidance. See IRM pt. 5.19.1.6.2.5.2 (Apr. 28, 2008); see also id. pt. 5.8.5.6.3(3) (Sept. 23, 2008) (allowing a monthly expense of $200 per vehicle for certain vehicles). We conclude that SO Howe did not abuse her discretion in calculating petitioners' expense related to the Toyota Tundra as $200 per month.

On the basis of the foregoing, we calculate petitioners' disposable monthly income for the first and second years of the statutory collection period as follows:

| Income and Expense | As Determined by Respondent | As Determined by the Court[1] |
|---|---|---|
| Income: | | |
| Gross wages | -0- | -0- |
| Rental income | -0- | -0- |
| Interest/rental income | $305 | $305 |
| Business income | 2,393 | 2,393 |
| Pension/Social Security benefits | 1,326 | 1,326 |
| N.T.'s Social Security benefits | 765 | 765 |
| Installment sale income | 776 | 291 |
| Total income | 5,565 | 5,080 |
| Expenses: | | |
| National standard | 1,152 | 1,152 |
| Housing and utilities | 895 | 895 |
| Automobile payment (Tundra) | 200 | 200 |
| Automobile payment (Chevy) | 200 | 200 |
| Automobile operating costs | 402 | 402 |
| Health insurance | 516 | 516 |
| Out of pocket medical expenses | 240 | 240 |
| Income taxes | 465 | 465 |
| Life insurance | 202 | 202 |
| Total expenses | 4,272 | 4,272 |
| Monthly disposable income | 1,293 | 808 |

[1]We do not decide the accuracy of income and expense items petitioners do not challenge.

We calculate petitioners' future income for the first 2 years of the statutory collection period as $19,392 ($808 times 24 months). We next adjust petitioners' disposable monthly income for the remaining 88 months of the statutory collection period and find that their disposable income for that period is at least $43 per month ($808 minus $765).[11] It follows that petitioners' future income for the balance of the statutory collection period is at least $3,784 ($43 times 88 months). We conclude that petitioners' future income for the balance of the statutory collection period is at least $23,176 ($19,392 plus $3,784).

### 4.   Recalculation of RCP

SO Howe was justified in including the contested properties in her calculation of petitioners' RCP and in treating the Lawry mortgages as dissipated assets. On our review of the record in the light of respondent's administrative guidance, we conclude that petitioners' future income potential is at least $23,176. Petitioners' RCP was thus at least $596,637 ($573,461 plus $23,176). SO Howe was justified in rejecting petitioners' offer

---

[11]We use the phrase "at least" because, although SO Howe credited petitioners with rental or interest income of $305 per month, the 2008 joint return indicated that petitioners received interest income of $487 per month ($5,841 divided by 12 months). Moreover, the record contains IRS transcripts indicating that First National paid petitioners interest income of $3,651 from account No. ending in 7355. Petitioners did not report that account on their Form 433-A, and they have not proved that they do not have such an account with First National.

because their RCP ($596,637) exceeded their offer-in-compromise ($500).

C.   Special Circumstances

Nor are we persuaded that petitioners' health concerns constitute special circumstances that obligated Appeals to accept an offer of $500 to compromise $33,652 of unpaid Federal income tax liabilities.  On brief and in an attachment to their Form 433-A, petitioners claim that they suffer from medical conditions which will affect their future ability to work.  As to Ms. Titsworth, they claim that she suffers from hypertension, extreme fatigue, irregular heartbeat, angina (chest pain), and osteoarthritis.  As to Mr. Titsworth, petitioners contend that he suffers from joint deterioration, torn retinas, cataracts, and early-onset dementia. Petitioners have submitted no objective evidence in support of their claims of medical frailty, and we reject those statements as self-serving.  See Tokarski v. Commissioner, 87 T.C. at 77.

IV. Conclusion

Petitioners have not shown that Appeals' rejection of their $500 offer-in-compromise was arbitrary, capricious, or without sound basis in fact or law.  We therefore hold that Appeals' determination was not an abuse of discretion.  In reaching our decision, we have considered all arguments made, and to the

extent that we have not specifically addressed them, we conclude that they are without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.