T.C. Memo. 2017-12

UNITED STATES TAX COURT

PAZZO PAZZO, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 6844-15L, 6845-15L,        Filed January 10, 2017.
6846-15L, 6848-15L.

Andrew G. Paradis and E. Martin Davidoff, for petitioner.

Brian J. Bilheimer, for respondent.

MEMORANDUM OPINION

THORNTON, Judge: In these consolidated cases petitioner seeks review

pursuant to sections 6320(c) and 6330(d)(1) of the determinations by the Internal

Revenue Service (IRS) to uphold the filings of two notices of Federal tax lien

**[\*2]** (NFTL) and two notices of intent to levy.[1]  In each of these consolidated cases, respondent has moved for summary judgment under Rule 121, contending that there are no disputed issues of material fact and that his determinations to uphold the collection actions were proper as a matter of law.  We agree and thus will grant the motions.

Background

The facts set forth below are based on the parties' pleadings, respondent's motions, petitioner's responses, and the attached documents.  When it petitioned the Court, petitioner had its principal place of business in New Jersey.

Petitioner has a long history, dating back to at least 1998, of financial difficulties and noncompliance with its Federal tax obligations.  On May 31, 2002, petitioner filed a bankruptcy petition under chapter 11 of the United States Bankruptcy Code.  In July 2004 petitioner's chapter 11 plan of reorganization was approved by the U.S. Bankruptcy Court for the District of New Jersey.  This plan included an IRS tax claim of $532,310 to be paid over six years according to a set schedule.

---

[1]All section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all dollar amounts to the nearest dollar.

**[\*3]** On March 1, 2012, an IRS bankruptcy specialist sent petitioner's president, Lawrence Berger, a letter stating that Mr. Berger had failed to make any payments for three years on the chapter 11 plan. The letter requested that Mr. Berger contact the specialist by March 22, 2012, and noted that failure to meet this deadline could result in the unpaid balances' being referred for regular collection action. Petitioner's unpaid balances were subsequently placed back into regular collection.

Notices and Collection Due Process (CDP) Hearing Requests

At issue in these cases are three notices that respondent sent petitioner, two CDP hearings, and two offers-in-compromise (OICs). The first notice, dated October 23, 2012, was a Letter 1058, Final Notice of Intent to Levy and Notice of Your Right to a Hearing, regarding unpaid taxes associated with (1) petitioner's Form 941, Employer's Quarterly Federal Tax Return, for tax periods ending March, June, and September 2002 and (2) its Form 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, for taxable years 1999, 2001, and 2004. These liabilities totaled $255,552, including interest as of November 2, 2012. On November 8, 2012, petitioner timely filed a Form 12153, Request for a Collection Due Process or Equivalent Hearing, requesting a face-to-face CDP hearing. It stated that petitioner and Mr. Berger had made payments of $200,000

**[*4]** in addition to the chapter 11 plan payments and that the bankruptcy specialist had failed to take these amounts into account in his March 1, 2012, letter. Petitioner requested a de novo review of all tax penalties and interest; proposed (without offering any specific installment amount) an installment agreement to pay the outstanding liabilities in full; and argued that paying any outstanding balance would cause it undue hardship and that given the economic climate it could not continue to make payments and operate its restaurant business.

The second notice, dated November 6, 2012, was a Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320 with respect to petitioner's unpaid tax liabilities attributable to (1) its Form 941 for tax periods ending June and December 2001, March, June, and September 2002 and (2) its Form 940 for taxable years 1999, 2001, and 2004. These liabilities totaled $208,635, including interest as of November 6, 2012.[2] On December 6, 2012, petitioner timely filed another Form 12153. This document, substantively

---

[2]Although the tax periods referenced in this NFTL include those in the October 23, 2012, Letter 1058, the amounts are different because of the inclusion in the Letter 1058 of penalties and interest for the Form 941 tax period ending June 2002 and the Form 940 taxable years 1999 and 2001.

**[\*5]** identical to the Form 12153 filed on November 8, 2012, contained identical arguments and requests.[3]

The third notice, dated April 25, 2013, was another Letter 1058 regarding petitioner's 2011 tax liability from Form 1120S, U.S. Income Tax Return for an S Corporation, which showed an unpaid liability of $1,173. On May 24, 2013, petitioner timely filed its third Form 12153, requesting a face-to-face CDP hearing. The letter requested (1) a de novo review of all tax, penalties, and interest, and (2) an installment agreement (without offering any specific installment amount) to pay any balance of all delinquent periods.

Correspondence, CDP Hearings, and OICs

On January 14, 2013, respondent sent petitioner letters confirming receipt of its November 8 and December 6, 2012, requests for CDP hearings. The following week, a settlement officer (SO) from the IRS Appeals Office began his review of petitioner's case and sent it a letter requesting a completed Form 433-B, Collection Information Statement for Businesses.

---

[3]For reasons not evident (and not relevant to these now-consolidated cases), respondent treated petitioner's November 8, 2013, submission as two separate requests: one for the Form 941 periods and one for the Form 940 periods. Although one hearing was conducted for both requests, respondent issued separate notices of determination. Thus, the determinations with respect to the Form 941 periods and Form 940 periods were petitioned separately therefrom under docket Nos. 6845-15L and 6844-15L, respectively.

**[*6]** On March 26, 2013, the SO held a telephone CDP hearing with petitioner's representatives. This was the first of the two CDP hearings; it covered petitioner's November 8 and December 6, 2012, requests for CDP hearings. During the hearing, the SO discussed petitioner's request for an OIC.[4] The SO set a deadline of April 16, 2013, to receive petitioner's OIC package. Petitioner's representatives expressed concern that credits for past payments were not being allocated properly to the trust fund recovery penalties (TFRPs) assessed against Mr. Berger.[5] The SO clarified that this hearing was for petitioner--not for Mr. Berger. No other issues were raised or discussed.

---

[4]Despite petitioner's Forms 12153 indicating that petitioner was requesting an installment agreement, petitioner's representatives discussed only an OIC to resolve petitioner's outstanding liabilities.

[5]Sec. 6672(a) provides generally that any person who is required to withhold and pay over any tax but who willfully fails to do so is liable for a TFRP equal to the total amount evaded, not collected, or not accounted for and paid over. The Commissioner is authorized to impose a TFRP on any "officer or employee of a corporation, or a member or employee of a partnership who as such officer, employee, or member is under a duty to perform" the duties referred to in sec. 6672. Sec. 6671(b). Petitioner failed to withhold and pay over taxes withheld from the wages of its employees, and Mr. Berger was determined by the IRS to be a responsible person who acted willfully with respect to those amounts. Thus, amounts paid by either petitioner or Mr. Berger towards those withheld taxes reduce the other's liability accordingly. See United States v. Energy Resources Co., 495 U.S. 545 (1990).

**[*7]**   On April 17, 2013, petitioner sent the SO a copy of its Form 1120S for taxable year 2011 along with a profit and loss statement from the fourth quarter of 2012.  For reasons not explained by the record, the Form 1120S was post-dated December 13, 2013, and reported a net loss of $646,674.  Petitioner also requested an extension of time until April 23, 2013, to file its Form 433-B.  The SO spoke with petitioner's representatives, who indicated that petitioner's financial information for the last three months showed a net positive income of $12,000; they also discussed the submitted documents and agreed to April 30, 2013, as the date for petitioner to submit its Form 433-B.

On April 30, 2013, petitioner's representatives telephoned the SO and requested another extension, which the SO granted.  On May 1, 2013, petitioner filed Form 656, Offer in Compromise, and Form 433-B.  This OIC offered to compromise petitioner's $704,200 of outstanding tax liabilities for $176,000, payable in 24 monthly installments of $7,333.  Form 433-B listed as petitioner's assets three Bank of America bank accounts (but provided no balances), miscellaneous kitchen equipment valued at $50,000, and a liquor license valued at $170,000.  And after applying discount rates, it showed $176,000 in available equity in assets.  The Form 433-B also reported petitioner's monthly business income as $179,902 and its monthly expenses as $188,976, leaving a monthly

[*8] deficit of $9,074 instead of the previously suggested net revenue of $12,000. Finally, the offer stated that Mr. Berger would fund the OIC by borrowing against assets not held in petitioner's name.

On May 10, 2013, petitioner's OIC was reviewed by respondent's Centralized Offer in Compromise unit (COIC). On May 23, 2013, the OIC was returned as not processable on the basis that petitioner had failed to submit the required $150 application fee and the initial payment of $7,333. The return letter also noted that petitioner was not in compliance with its Federal income tax reporting for taxable years 2010 and 2012. The letter instructed petitioner on how to fix the defects (i.e., sending the appropriate payments and supporting financial documentation and filing Forms 1120S for taxable years 2010 and 2012) and submit a new OIC.

On June 6, 2013, the SO noticed the rejection of petitioner's OIC and after reviewing his records discovered that although petitioner had not submitted the required $150 application fee, it had submitted the requisite first payment of $7,333. He followed up with petitioner's representatives to help facilitate the process. On June 18, 2013, petitioner resubmitted its OIC. This OIC included numerous documents, including new Forms 656 and 433-B; the required application fee and payments; petitioner's 2010 Form 1120S and 2012 Form 7004,

**[\*9]** Application for Automatic Extension of Time to File Certain Business Income Tax, Information, and Other Returns; and supporting financial documentation. It reiterated petitioner's original offer as well as its earlier arguments.

On June 21, 2013, while this resubmitted OIC was being processed, the IRS sent petitioner a letter confirming receipt of petitioner's May 24, 2013, request for a CDP hearing. And on July 1, 2013, the SO handling petitioner's first CDP hearing was assigned to handle this one as well. The SO reviewed petitioner's administrative file; noted that he had not yet heard back from the COIC regarding petitioner's resubmitted OIC; and set a reminder to follow up in two weeks. Upon following up, the SO noticed that the Automated Offer in Compromise (AOIC) system reflected updated information from petitioner's resubmitted OIC.

On August 30, 2013, the SO performed an independent evaluation of petitioner's resubmitted OIC. He noted that although this OIC was deemed processable, the profit and loss statement had not been updated. He telephoned petitioner's representatives to discuss these findings. Because of a system malfunction and a two-week Government shutdown, the SO did not resume his review of petitioner's OIC until October 23, 2013.

**[\*10]** On October 24, 2013, the SO held petitioner's second CDP hearing, focusing this time on petitioner's 2011 Form 1120S liability. Petitioner's representatives raised no issues apart from noting that the period at issue was included in the resubmitted OIC. The SO discussed the terms of the OIC and requested that by November 14, 2013, petitioner supply a valuation of both the restaurant equipment and the liquor license, as well as a current profit and loss statement.

In the course of a review on November 25, 2013, the SO's supervisor noted that petitioner still had several unresolved compliance issues and suggested that if it had not yet submitted the information needed to compute its reasonable collection potential (RCP), i.e., the asset appraisals and current profit and loss statement, then the SO should close the case. The SO, however, gave petitioner two additional weeks to submit the requested documentation.

On December 18, 2013, having received none of the requested documents, the SO telephoned petitioner's representatives' office. The office indicated that the former representative no longer worked at the firm and suggested that the SO's October 24, 2013, request had not been properly passed along. The SO explained that he needed petitioner's assets appraised for the RCP calculation, and he provided an extension until January 17, 2014, to receive the missing information. The SO stated that if this deadline was not met, he would have to close the case.

**[*11]** On January 6, 2014, petitioner obtained written appraisals of its restaurant equipment and liquor license--$37,855 and $550,000, respectively--and sent that information to the SO the following week. The SO reviewed the appraisals and called petitioner's representatives on February 4, 2014, to discuss his findings. During their conversation the SO explained that the new appraisal of the liquor license required petitioner to submit a new OIC to reflect the increased value. Petitioner's representatives agreed to revise and resubmit the OIC by February 18, 2014. The parties scheduled a followup telephone call for February 25, 2014.

On February 18, 2014, petitioner sent the SO its revised Forms 656 and 433-B and supporting documentation. To reflect the new valuation, petitioner increased its OIC to $470,284--payable in 24 installments of $19,595--to settle all of its outstanding tax liabilities. The parties held their scheduled telephone conference on February 25, 2014, discussing the revised OIC and the SO's belief that petitioner had failed to file its Federal tax returns for 2010 and 2012.[6] Petitioner's representatives were unaware of any noncompliance. The SO set March 5, 2014, as the deadline for submitting the returns.

---

[6]The record indicates that petitioner submitted its 2010 Form 1120S on June 18, 2013; respondent received it the following day. The SO discovered the missing 2010 Form 1120S on April 16, 2014.

[*12] On March 18, 2014, petitioner made its first payment of $19,291. Along with the check, petitioner sent a letter designating this payment to certain trust fund liabilities. Because the SO knew that petitioner's representatives were interested in resolving petitioner's trust fund liabilities, which had given rise to corresponding TFRPs assessed against Mr. Berger, he spent time ensuring that the payment was correctly posted.

Still waiting for petitioner's Forms 1120S, which he had requested be provided by March 5, 2014, the SO telephoned petitioner's representatives on March 26, 2014, and provided a one-week extension. On March 28, 2014, petitioner sent the SO a letter containing an addendum to the earlier filed Form 656, copies of petitioner's 2010 and 2012 Forms 1120S, and a copy of petitioner's 2013 Form 7004. Upon receiving the requested documents, the SO began the OIC closing process.

On April 28, 2014, petitioner sent to the SO, along with the second payment, a second letter updating its previous payment designation: Payments were to be applied first to the unpaid employment taxes (trust fund portion, penalties on the trust fund portion, interest on the non-trust-fund portion, non-trust-fund portion, penalties on the non-trust-fund portion, and interest on the non-trust-fund portion, in that order), then to the unpaid unemployment taxes

**[*13]** (unemployment taxes, penalties on the unemployment taxes, and interest on the unemployment taxes, in that order).

On May 6, 2014, the SO spoke with petitioner's representatives. He requested an addendum be filed to fix a scrivener's error and to update the list of tax periods included in the OIC. The SO explained that in order to close the OIC, all periods that petitioner wished to be included had to be assessed--the originally included liabilities and the Form 1120S liabilities for 2010 and 2012. The addendum was mailed the following day "delineat[ing] the types of tax and periods to which * * * [petitioner's February 18, 2014, OIC] relates". This letter expanded the list of tax liabilities to include petitioner's Form 1120S liabilities for taxable years 2010 and 2012; the letter acknowledged that these amounts had not yet been assessed. By the time petitioner's Forms 1120S were posted, on July 3, 2014, both of petitioner's monthly payments were late; one was nearly a month late.

The SO continued to process petitioner's OIC and ordered an asset search to verify petitioner's self-calculated RCP. The SO's supervisor again reviewed the case and confirmed that, as of August 11, 2014, the Appeals Office was still waiting for the asset search. During the wait, petitioner made three additional payments. For reasons unexplained by the record, these payments were not posted

[*14] to the requested tax periods. The SO, however, sought to straighten out the misallocation, reexamined the TFRPs assessed against Mr. Berger, and telephoned petitioner's representatives on September 30, 2014, to confirm the remaining balances.

The SO spoke with petitioner's representatives again the following week, explaining that there were still three trust fund periods with outstanding TFRP balances assessed against Mr. Berger. Petitioner's representatives confirmed that future payments should be applied first to petitioner's corresponding trust fund liabilities and that respondent could apply any remaining payments in the Government's best interest. On October 9, 2014, petitioner's representatives sent the SO a fax, following up on their telephone call. The fax noted the pending OIC and indicated that if it were accepted, all of petitioner's outstanding liabilities would be settled.

The asset search was returned on October 15, 2014, indicating that petitioner had no assets other than those disclosed. The SO received the asset-search memorandum on October 31, 2014, which he discussed with petitioner's representatives that same day. During their conversation, the SO walked through each trust fund tax assessed against petitioner (and the TFRP correspondingly

[*15] assessed against Mr. Berger), noting that the trust fund portions of two periods remained unsatisfied.

On October 31, 2014, petitioner submitted its October payment. The SO noted that this payment would satisfy all petitioner's outstanding trust fund liabilities. Petitioner timely submitted its November payment, and the SO received from petitioner's representatives, on December 1, 2014, substantiation of two payments not previously listed in petitioner's records. He spent time the following day ensuring that the files were complete, that the RCP calculations were accurate, and that upon his receiving confirmation of updated payment information, the OIC could be recommended to be accepted.

In January 2015 when he received confirmation of the payments' application, the SO noticed that three issues had arisen with petitioner's OIC: (1) petitioner had failed to file its Form 1120S for taxable year 2013; (2) the Form 433-B needed to be recertified; and (3) petitioner had failed to make its December 2014 payment. On January 20, 2015, the SO explained these issues to petitioner's representatives. They agreed upon January 30, 2015, as the final deadline for submission.

On January 28, 2015, one of petitioner's representatives spoke with the SO. He explained that petitioner would be unable to submit the requested 2013 Form

[*16] 1120S until the end of February; and not only would petitioner be unable to submit the past-due December payment, but petitioner also would not be making its January payment. The SO explained to the representatives that petitioner's compliance with its tax filings and OIC payments was of paramount importance for the OIC's acceptance; he reiterated the deadline of January 30, 2015. Nonetheless, petitioner's representatives requested another extension, until February 14, 2015. The SO spoke with his supervisor about it. Although the supervisor felt that petitioner had been given enough time, the SO convinced him to extend the deadline until February 2, 2015.

On February 2, 2015, one of petitioner's representatives telephoned the SO. Despite his earlier assertion that petitioner's 2013 Form 1120S would not be ready until the end of February, it was complete and ready for submission. Unfortunately, the representative reported, petitioner was not in a position to make either the December 2014 or the January 2015 payment; he again requested an extension of time. The SO explained that petitioner's compliance--or noncompliance--with the terms of its own OIC would determine its acceptance.

That afternoon the SO received an email from petitioner's representatives stating that petitioner had "unfortunately run into financial difficulties"; it reiter-ated that petitioner's "monthly income and expenses * * * [were] relatively

**[*17]** unchanged" from those stated in petitioner's June 8, 2013, and February 1, 2014, disclosures. The email acknowledged petitioner's missing payments and requested that petitioner be allowed to remit them along with the February 2015 payment--a sum of $57,873-- no later than February 23, 2015. In response, the SO telephoned petitioner's representatives and denied this final request for extension.

The SO thereupon closed the case and on February 11, 2015, sent to petitioner four notices of determination: (1) sustaining the proposed levy action with respect to the Form 941 tax periods ending March, June, and September 2002 and the Form 940 tax liabilities for taxable years 1999, 2001, and 2004; (2) sustaining the notice of filing of Federal tax lien with respect to the Form 941 tax periods ending December 2001 and March, June, and September 2002; (3) sustaining notice of filing of Federal tax lien with respect to the Form 940 tax liabilities for taxable years 1999, 2001, and 2004; and (4) sustaining the proposed levy action with respect to the Form 1120S tax liability for taxable year 2011.

Petitioner timely petitioned this Court with respect to each of the notices of determination. Respondent filed in each case a motion for summary judgment and, after the cases were consolidated, a motion to permit levy. Petitioner filed its responses to the motions for summary judgment and the motion to permit levy

**[*18]** along with a motion to remand.  Respondent filed his response to petitioner's motion to remand.

Discussion

I.     <u>Respondent's Motions for Summary Judgment</u>

The purpose of summary judgment is to expedite litigation and avoid unnecessary and time-consuming trials.  <u>Fla. Peach Corp. v. Commissioner</u>, 90 T.C. 678, 681 (1988).  The Court may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law.  Rule 121(b); <u>Sundstrand Corp. v. Commissioner</u>, 98 T.C. 518, 520 (1992), <u>aff'd</u>, 17 F.3d 965 (7th Cir. 1994).  If a moving party properly makes and supports a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of such party's pleading" but must set forth specific facts, by affidavit or otherwise, showing that there is a genuine dispute for trial.  Rule 121(d).

Upon due consideration of the parties' motions, supporting declarations, and responses thereto, we conclude that no material facts are in dispute and that judgment may be rendered for respondent as a matter of law.

**[\*19]**  A.  <u>Standard of Review</u>

In an action such as this to review IRS administrative determinations under sections 6320(c) and 6330(d)(1), if the underlying tax liability is properly at issue, the Court reviews the IRS determinations de novo.  <u>Goza v. Commissioner</u>, 114 T.C. 176, 181-182 (2000).  Otherwise, the Court reviews the determinations for abuse of discretion.  <u>Id.</u> at 182.  Abuse of discretion exists when a determination is arbitrary, capricious, or without sound basis in fact or law.  See <u>Murphy v. Commissioner</u>, 125 T.C. 301, 320 (2005), <u>aff'd</u>, 469 F.3d 27 (1st Cir. 2006).

A taxpayer may challenge the existence or amount of underlying liability in a CDP proceeding only if the taxpayer received no notice of deficiency and otherwise had no opportunity to contest the liability.  <u>See</u> secs. 6320(c), 6330(c)(2)(B); sec. 301.6330-1(e)(3), Q&A-E2, Proced. & Admin. Regs.  In any event, a taxpayer's underlying liability is not properly subject to judicial review pursuant to section 6320(c) or section 6330(d)(1) if the issue was not properly raised in the CDP hearing.  <u>See</u> <u>Thompson v. Commissioner</u>, 140 T.C. 173, 178 (2013).

Although each of petitioner's Forms 12153 disputes the underlying liabilities, neither petitioner nor its representatives raised the issue during either of its CDP hearings.  Petitioner similarly does not dispute its underlying liabilities in

**[*20]** its petitions or response to respondent's motion for summary judgment. Since there is no dispute concerning the underlying tax liabilities, we review the IRS' determinations for abuse of discretion. See Goza v. Commissioner, 114 T.C. at 182.

B.    Analysis

In deciding whether the SO abused his discretion in sustaining the collection actions, we consider whether he:  (1) properly verified that the requirements of any applicable law or administrative procedure have been met; (2) considered any relevant issues petitioner raised; and (3) determined whether "any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of * * * [petitioner] that any collection action be no more intrusive than necessary."  Sec. 6330(c)(3).

The record establishes that the SO conducted several thorough reviews of petitioner's account, determined that the taxes had been properly assessed, and verified that other requirements of applicable law and administrative procedure were followed.  Petitioner contends primarily that the SO abused his discretion in rejecting its revised OIC--particularly by taking too long to evaluate the OIC and by failing to provide adequate additional time for petitioner to bring itself into compliance with its payment obligations.  Petitioner also contends that the SO

**[\*21]** abused his discretion in failing to adequately consider petitioner's "economic hardship".

Section 7122(a) authorizes compromise of a taxpayer's Federal income tax liability. "The decision to entertain, accept or reject an offer in compromise is squarely within the discretion of the appeals officer and the IRS in general." Gregg v. Commissioner, T.C. Memo. 2009-19 (quoting Kindred v. Commissioner, 454 F.3d 688, 696 (7th Cir. 2006)). Consequently, in reviewing this determination, we do not substitute our judgment for that of Appeals and decide whether in our opinion petitioner's OIC should have been accepted. See Keller v. Commissioner, T.C. Memo. 2006-166, aff'd in part, 568 F.3d 710 (9th Cir. 2009). Instead, we review this determination for abuse of discretion.

Petitioner argues that it was an abuse of discretion for the SO to return its OIC after having granted two extensions of time to return to compliance with its OIC payment obligations because petitioner's representative requested (and was denied) an additional three-week extension of time. But petitioner's argument glosses over the statutory provision applicable here. Section 7122(c)(1)(B)(ii) provides: "Any failure to make an installment (other than the first installment) due under such offer-in-compromise during the period such offer is being evaluated by

[*22] the Secretary may be treated by the Secretary as a withdrawal of such offer-in-compromise."

Furthermore, an Appeals officer does not abuse his discretion by rejecting an OIC where the taxpayer fails to fulfill the terms of the taxpayer's own offer. Tucker v. Commissioner, T.C. Memo. 2014-103, at *23-*24. Petitioner thrice submitted Forms 656, offering to compromise its outstanding tax liability for a substantially reduced amount. Each OIC offered to make certain monthly payments in an amount and on a date selected by petitioner. The text of each Form 656 mirrors section 7122(c)(1)(B)(ii) in stating, in boldface: "[Petitioner] must continue to make these monthly payments while the IRS is considering the offer. Failure to make regular monthly payments will cause your offer to be returned." It was not the SO's duty or responsibility to ensure that petitioner made the payments it proposed. Because petitioner failed to live up to the terms of its own offer, we find that the SO did not abuse his discretion in denying the request for additional time and rejecting petitioner's OIC.[7]

---

[7]Petitioner argues that the Internal Revenue Manual (IRM) required the SO to provide it with a 15-day extension of time from the date the SO brought the missing payment to petitioner's attention. See IRM 5.8.4.25.1(10) (June 1, 2010). The IRM specifies, however, that a single 15-day extension of time will be provided. At the time the SO notified petitioner's representatives about the missing December 2014 payment, on January 20, 2015, there was only one

(continued...)

[*23] Petitioner suggests that if the SO had not delayed the process and had granted the requested extensions of time for petitioner to comply with its payment obligations, the OIC would have been accepted. Consequently, petitioner concludes, these cases should be remanded for further consideration. We disagree.

The record convinces us that the SO could properly have rejected petitioner's OIC at various points during the pendency of petitioner's CDP hearings, for a variety of reasons. We will discuss four of those reasons below: (1) missing, incomplete, or inaccurate financial information; (2) noncompliance with Federal tax return filing obligations; (3) the valuation of petitioner's assets; and (4) noncompliance with the self-set terms of petitioner's OIC.

---

[7](...continued)
missing payment. Upon failing to remit its January 2015 payment, petitioner was not entitled to a 15-day extension of time to return to compliance. The SO could have properly returned petitioner's OIC when petitioner missed this payment. Instead, the SO provided petitioner two days, and then three additional days, to make the missing payments. On February 2, 2015--13 days after the SO brought the missing December payment to petitioner's attention--petitioner's representatives requested three additional weeks for petitioner to remit payment for December 2014, January 2015, and February 2015. This strongly suggests that even if the SO had originally provided petitioner 15 days (instead of 13 days) to submit its missing December 2014 payment, petitioner would have been unable to meet even that extended deadline. While the IRM contemplates taxpayers' requesting a second extension of time, it does not require acceptance of such a request.

**[\*24]**      1.  <u>Missing, Incomplete, or Inaccurate Financial Information</u>

It is well settled that an Appeals officer does not abuse his discretion in rejecting a collection alternative where the taxpayer has failed, after being given sufficient opportunities, to supply the requisite financial information.  <u>See, e.g.</u>, <u>Hawkins v. Commissioner</u>, T.C. Memo. 2015-245, at \*9; <u>Maselli v. Commissioner</u>, T.C. Memo. 2010-19, 99 T.C.M. (CCH) 1089, 1092 (2010); <u>Roman v. Commissioner</u>, T.C. Memo. 2004-20, 87 T.C.M. (CCH) 835, 838 (2004).  "Taxpayers must submit current financial data when proposing an OIC based on doubt as to collectibility."  <u>Reed v. Commissioner</u>, 141 T.C. 248, 255 (2013).  The SO provided petitioner at least five extensions of time to submit or make current its financial information.

2.  <u>Noncompliance With Federal Tax Return Filing Obligations</u>

The IRS' established policy is to require taxpayers to be in compliance with current filing and estimated tax payment requirements to be eligible for collection alternatives.  <u>See</u> <u>id.</u> at 256-257. Despite petitioner's contention, an Appeals officer is well within his discretion to require current compliance with Federal tax return filings.  <u>Hartman v. Commissioner</u>, __ F. App'x __, 2016 WL 3947575, at \*2 (3d Cir. July 22, 2016), <u>aff'g</u> T.C. Memo. 2015-129; <u>Christopher Cross, Inc. v. United States</u>, 461 F.3d 610, 613 (5th Cir. 2006) ("The failure to timely pay owed

[*25] taxes is a perfectly reasonable basis for rejecting an offer in compromise relating to other unpaid taxes."); Reed v. Commissioner, 141 T.C. at 257 ("[An Appeals officer] does not abuse his discretion by returning an OIC based on a taxpayer's failure to meet current tax obligations.").

During the course of petitioner's administrative proceedings, petitioner was not in full compliance with its Federal income tax reporting until February 2, 2015, having at various times been out of compliance with filing requirements for Forms 1120S for 2010, 2012, and 2013. On numerous occasions the SO sought out petitioner's representatives to notify them of the issue and repeatedly granted extensions of time for submitting the missing returns. But for the SO's efforts, petitioner's OICs might have been returned earlier in the CDP process.

### 3. Valuation of Petitioner's Assets

The IRS may reject an OIC where the taxpayer's RCP is greater than the amount he proposes to pay. See Johnson v. Commissioner, 136 T.C. 475, 486 (2011), aff'd, 502 F. App'x 1 (D.C. Cir. 2013); Lindley v. Commissioner, T.C. Memo. 2006-229 (finding that the Appeals officer did not abuse his discretion by rejecting an OIC $25,535 below the taxpayer's RCP), aff'd on this issue sub nom. Keller v. Commissioner, 568 F.3d 710 (9th Cir. 2009). Appeals officers are generally directed to reject offers substantially below the taxpayer's RCP where

[*26] the offer is premised, as was petitioner's, on doubt as to collectibility. See Rev. Proc. 2003-71, 2003-2 C.B. 517.

Petitioner's original OIC failed to list its then-current bank account balances. And in both the first and resubmitted OICs, petitioner offered to compromise its outstanding liabilities, exceeding $700,000, for $176,000–which was based on a self-calculated RCP and self-defined asset valuations. One such asset was petitioner's liquor license, initially valued at $170,000. In evaluating the OIC and in preparing for petitioner's second CDP hearing, the SO realized that if the RCP were to be based on the value of petitioner's assets, they would need to be appraised.

During petitioner's second CDP hearing on October 24, 2013, the SO discussed with petitioner's representatives the need for appraisal of the kitchen equipment and the liquor license. The SO provided petitioner multiple deadlines for submitting this information, even providing a two-week extension contrary to his supervisor's recommendation that he close the case. When the appraisal was submitted, it revealed that petitioner had undervalued the liquor license by $380,000--more than twice the amount of its initial OIC. But instead of rejecting the resubmitted OIC, the SO provided additional time for petitioner's representatives to submit a revised OIC.

**[*27]**     4.  Noncompliance With OIC Terms

As discussed above, an Appeals officer does not abuse his discretion when rejecting an OIC where the taxpayer fails to fulfill the terms of his own offer. Tucker v. Commissioner, at *23-*24.  During the time in which petitioner's revised OIC was being considered, the terms of the OIC required petitioner to make 11 monthly payments.  Of these payments, three were not timely paid, and the final two were never paid.   The SO provided two extensions of time for petitioner to make the missing payments, but petitioner failed to meet either deadline, instead asking for three more weeks and suggesting that it would somehow obtain $58,785 to pay the two missing payments and the upcoming February 2015 payment.

For any of the reasons described above, the SO could have properly returned or rejected petitioner's OIC and closed the case.  See Kreit Mech. Assocs., Inc. v. Commissioner, 137 T.C. 123, 134 (2011) (holding that an Appeals officer is not required to negotiate with a taxpayer indefinitely or wait any specific amount of time after a CDP hearing to issue a notice of determination).  The record shows, however, the SO's willingness to assist petitioner in returning to compliance.  We find no abuse of discretion in this regard.

**[*28]** Petitioner suggests that respondent should have accepted its OIC based on effective tax administration and that the proposed collection action would cause economic hardship. Insofar as petitioner means to suggest that its economic circumstances gave rise to "economic hardship" as a grounds for compromise, within the meaning of section 301.7122-1(b), Proced. & Admin. Regs., the argument is without merit. This regulation specifically restricts "economic hardship" to individuals. Petitioner is not an individual; thus "economic hardship" relief is not available here.

In any event, we understand petitioner's argument to be that the SO failed to take into account its individual circumstances when he was performing the balancing analysis under section 6330(c)(3). On the basis of our thorough review of the extensive record in these cases, we find that the SO properly balanced "the need for the efficient collection of taxes with the legitimate concern of * * * [petitioner] that any collection action be no more intrusive than necessary." Sec. 6330(c)(3). On several occasions, petitioner's representatives conveyed to the SO that petitioner's revenue was negative every month and that petitioner had been in some form of financial distress since at least 1998. But at no point did petitioner or its representatives suggest that it could pay nothing towards its outstanding liabilities. On the contrary, petitioner suggested the terms of each OIC, and the

**[\*29]** SO expressed willingness to accept each of them subject to petitioner's compliance with Federal tax filing and periodic payment requirements.

The record reflects the SO's willingness to work with petitioner to achieve a satisfactory resolution. And despite his supervisor's repeated instructions to close the case, on several occasions the SO provided additional time for petitioner to return to compliance. Finally, throughout this process, the SO sought to apprise petitioner's representatives of updates and work with them to return petitioner to compliance. None of these facts is indicative of a decision void of consideration of petitioner's economic circumstances; the SO issued the notices of determination only after petitioner failed to return to compliance with payments it had suggested in the first instance. This was not an abuse of discretion.

In its petitions, petitioner suggests that Mr. Berger "is in the process of securing, and believes he has obtained, financing to enable [p]etitioner to become current with the terms of the Amended Offer in Compromise." Although such circumstances might provide a reason for petitioner to submit another OIC to respondent, they do not compel a conclusion that the SO abused his discretion.

Petitioner finally argues that we should remand these cases for additional consideration. We are not convinced it is necessary or would be productive to do so. See Lunsford v. Commissioner, 117 T.C. 183, 189 (2001); Kakeh v.

[*30] Commissioner, T.C. Memo. 2015-103, at *13.  The purpose of a remand is

not to afford a "do over" for a taxpayer whose missteps during the CDP process

caused its OIC to be rejected.  Kakeh v. Commissioner, at *13.  It appears to us

that petitioner is seeking a "do over" here.

Finding no abuse of discretion in any respect, we will grant respondent's

motions for summary judgment and deny petitioner's motion to remand.

II.    Respondent's Motion To Permit Levy

We turn now to respondent's motion to permit levy.  The effect of granting

this motion would be to allow the IRS to levy immediately in an effort to collect

petitioner's tax liabilities discussed above, without waiting for the decisions in

these cases to become final.

A taxpayer's request for a CDP hearing automatically suspends the levy

process "for the period during which such hearing, and appeals therein, are pend-

ing."  Sec. 6330(e)(1); sec. 301.6330-1(g)(2), Q&A-G1, Proced. & Admin. Regs.

("The suspension period continues until * * * the expiration of the time for

seeking judicial review or upon exhaustion of any rights to appeals following

judicial review.").[8]  This suspension, however, "shall not apply to a levy action

---

[8]Sec. 6320(c) provides that "[f]or purposes of this section, subsection[] * * * (e) * * * of section 6330 shall apply."  Thus, the following discussion of sec.

(continued...)

**[\*31]** while an appeal is pending if the underlying tax liability is not at issue in the appeal and the court determines that the Secretary has shown good cause not to suspend the levy." Sec. 6330(e)(2); see Burke v. Commissioner, 124 T.C. 189, 196 (2005).

Petitioner did not meaningfully challenge the existence or amount of its tax liabilities for the years at issue at any stage of these proceedings. Accordingly, the question is whether respondent has shown "good cause not to suspend the levy" during the appeal process.[9] Sec. 6330(e)(2).

Section 6330 does not include a definition of the term "good cause". We have held, however, that the Commissioner may show good cause that a levy should not be suspended where the taxpayer "used the collection review procedure to espouse frivolous and groundless arguments and otherwise needlessly delay collection." Burke v. Commissioner, 124 T.C. at 196-197.

Respondent has not shown good cause why the levy should be allowed to proceed immediately. Our review of the extensive record does not show that

___

[8](...continued)
6330(e) applies equally to the liens at issue herein.

[9]Much like the statute, the legislative history of sec. 6330 simply states that "[l]evies will not be suspended during the appeal if the Secretary shows good cause why the levy should be allowed to proceed." H.R. Conf. Rept. No. 105-599, at 266 (1998), 1998-3 C.B. 747, 1020.

**[*32]** petitioner used the collection review process to espouse frivolous and groundless arguments or otherwise needlessly delay collection. During the collection review process petitioner's arguments had at least colorable merit. And despite the age of the underlying liabilities and petitioner's contributions to the delays in the OICs' consideration, we do not believe that petitioner's intent was to needlessly delay respondent's collection action. We will deny respondent's motion to permit levy.

To reflect the foregoing,

<u>Appropriate orders and decisions</u>

<u>will be entered</u>.